10-1300-pr
Rivas v. Fischer

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: December 08, 2011                                      Decided: July 9, 2012)

Docket No. 10-1300-pr

HECTOR RIVAS,

*Petitioner-Appellant*,

v.

BRIAN FISCHER, Superintendent,
Sing Sing Correctional Facility,

*Respondent-Appellee.*

Before: CABRANES, POOLER, and SACK, *Circuit Judges.*

Petitioner-appellant Hector Rivas appeals from a judgment of the United States District Court for the Northern District of New York (Gary L. Sharpe, *Judge*), following a remand of the cause by this Court, dismissing as time-barred his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We agree with the District Court that Rivas's petition was not timely filed and that he is not entitled to equitable tolling, but we conclude that Rivas has successfully presented a "gateway" showing of actual innocence under the standard set by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006). We further conclude, as a matter of first impression in this Circuit, that such a showing entitles him to an equitable exception from the limitations period set forth in § 2244(d). Accordingly, we reverse the judgment of the District Court and remand with instructions to consider the merits of Rivas's habeas petition.

RICHARD M. LANGONE, Langone & Associates, PLLC, Levittown, NY, *for Petitioner-Appellant*.

PRISCILLA STEWARD, Assistant Attorney General (Barbara D. Underwood, Solicitor General, Roseann B. MacKechnie, Deputy Solicitor General for Criminal Matters, and Lea La Ferlita, Assistant Attorney General, *on the brief*), *for* Eric T. Schneiderman[*], Attorney General of the State of New York, NY, *for Respondent-Appellee*.

JOSÉ A. CABRANES, *Circuit Judge*:

The issue in this appeal is whether petitioner-appellant Hector Rivas—who is currently serving an indeterminate life sentence for the second-degree murder of his former girlfriend, Valerie Hill—should be permitted to present in federal court his claim that constitutional error at his criminal trial renders his current confinement unlawful. The merits of Rivas's constitutional claims are not before us. Rather, we address only whether his petition for a writ of habeas corpus under 28 U.S.C. § 2254 was timely filed, or, if untimely, whether he should nevertheless be permitted to pursue those claims in federal court under the circumstances here presented.

When Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), it imposed a one-year period of limitation on petitioners seeking federal collateral review of state convictions pursuant to 28 U.S.C. § 2254. *See* 28 U.S.C. § 2244(d).[1] The Supreme Court has recognized that a "credible" and "compelling" claim

---

[*] Named officials have been substituted for their predecessors pursuant to Fed. R. App. P. 43(c)(2).

[1] Section 2244(d) provides as follows:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

> (A) the date on which the judgment became final by the conclusion

of actual innocence may provide a "gateway" through other procedural barriers to habeas relief, *see Schlup v. Delo*, 513 U.S. 298, 324, 315 (1995) (successive petitions); *House v. Bell*, 547 U.S. 518, 521–22 (2006) (state procedural default), but it remains an open question both in the Supreme Court and in this Circuit whether such a claim may allow a petitioner to circumvent AEDPA's limitation period. In the years since § 2244(d) went into effect, we have heard several appeals from prisoners who have asserted that their claims of actual innocence should provide an equitable ground for allowing them to pursue habeas corpus relief notwithstanding their failure to timely file a petition. *See, e.g.*, *Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004); *Whitley v. Senkowski*, 317 F.3d 223 (2d Cir. 2003); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107 (2d Cir. 2000). We have thus far resisted deciding whether equity demands such an exception, explaining that we would only do so "in a proper case," *Whitley*, 317 F.3d at 225, "where a petitioner is able to make a credible showing of actual innocence based on new evidence," *Doe*, 391 F.3d at 174.

---

of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In this case, which returns to us following a remand to the District Court for development of the record, *see Rivas v. Fischer*, 294 F. App'x 677, 679 (2d Cir. 2008) ("*Rivas II*"), Rivas has raised a credible and compelling claim of actual innocence, as those concepts are understood in the relevant habeas jurisprudence. His claim is based on new information not presented to the jury that dramatically undermines the central forensic evidence linking him to the crime of which he was convicted. In sum and substance, Rivas has shown, through the essentially unchallenged testimony of a respected forensic pathologist, that the victim was almost certainly killed at a time when he had an uncontested alibi, and not earlier, as the prosecution had contended at his trial. We are not here called to determine whether Rivas is in fact innocent. However, on the record before us, we "cannot have confidence in the outcome of [Rivas's] trial" unless we can be assured that "the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 315.

Here presented with a "proper case," we now conclude, as a matter of first impression in this Circuit, that a credible and compelling showing of actual innocence under the standard described by the Supreme Court in *Schlup* and *House* warrants an equitable exception to AEDPA's limitation period, allowing the petitioner to have his otherwise time-barred claims heard by a federal court. Because Rivas has made such a showing, we reverse the decision of the United States District Court for the Northern District of New York (Gary L. Sharpe, *Judge*) dismissing his petition for habeas relief and remand for full consideration of his underlying constitutional claims.

## BACKGROUND

The following background is taken from the record of Rivas's criminal trial, his state collateral proceeding, and the evidentiary hearing held by the District Court on remand. Although we refer in the margins to relevant newspaper articles, we do not rely on them in the disposition of this appeal.

4

## A. The Murder of Valerie Hill

At approximately 11:45 a.m. on Monday, March 30, 1987, Randall Hill ("Randall") discovered the lifeless body of his twenty-eight-year-old daughter, Valerie Hill ("Hill"), on the living-room floor of her apartment on Hickok Avenue in Syracuse, New York. Transcript of the Trial of Hector Rivas (March 17, 1993) ("Trial Tr.") at 103.

Randall had last seen his daughter on Friday night, March 27, when the two met for dinner at a nearby restaurant. He later recalled that Hill seemed upset during their meeting and did not eat anything. *Id.* at 96–98. During their conversation, Hill informed her father that she was planning to spend the weekend visiting a friend in the Albany area and would not return until Sunday evening. *Id.* at 99. Hill left the restaurant at approximately 8:15 p.m. on Friday. *Id.* at 97–98. The friend Hill planned to visit, Laura Adams, later testified that she called Hill "dozens of times" on Friday night and throughout the weekend, but never reached her, although she encountered at least one "busy" signal. *Id.* at 217–19, 221. Randall also had no success when he attempted to call Hill on Sunday night and again Monday morning. *Id.* at 99–100.

On Monday morning, Randall went to the hospital where Hill was employed as a pediatric nurse (and where Randall's wife was then admitted as a patient) and discovered that Hill had not reported to work. *Id.* at 101, 103. Concerned, he drove to Hill's apartment, where he found her car parked in the driveway. Randall let himself in through the unlocked side door and discovered Hill lying "face down on the carpet" in her living room. She was wearing a bathrobe, which was pulled "up around her shoulders," and was otherwise naked. *Id.* at 100–03. The belt of the bathrobe was wrapped around her neck. *Id.* at 157.

Randall immediately called the police, as well as his son, David. *Id.* at 104. Arriving at the scene, police investigators found no signs of forced entry into Hill's apartment, which was on the

bottom floor of a two-family house. *Id.* at 107, 228–29. The apartment was "very neat," and at first nothing appeared to be out of order. *Id.* at 228. A number of cigarettes of the brand Rivas smoked were found in an ashtray in Hill's kitchen. *Id.* at 150–51, 638. Later testing revealed that fingerprints on the ashtray, as well as on a bottle of wine, belonged to Rivas. *Id.* at 591–93.[2] In addition to Rivas's and Hill's fingerprints, an unidentified set of prints was taken from the telephone. *Id.* at 588. Missing from the apartment was an airline ticket that Hill had collected from her travel agent on the afternoon of Friday, March 27.

After learning from Randall and David that Hill had recently broken up with Rivas, police officers went to Rivas's house in Cazenovia, a town about twenty miles southeast of Syracuse. *Id.* at 235. Rivas agreed to accompany the officers to the Syracuse police station. Sergeant John D. Brennan later testified that Rivas appeared nervous,[3] but was cooperative and did not inquire as to why he was being questioned. *Id.* at 237–28. At the police station, Rivas was taken to an interrogation room where police proceeded to question him for approximately twelve hours. Despite the fact that he was interrogated at length regarding his activities the weekend of Hill's death, Rivas was never informed of his *Miranda* rights because, the police officers later insisted, he was not regarded as a suspect at that time. Trial Tr. at 239. At approximately 5:30 p.m., after over two hours of questioning, police informed Rivas that Hill had been killed. According to Brennan, Rivas exhibited no discernible reaction upon hearing this news. *Id.* at 247.

---

[2] Rivas, having dated Hill, had been in her apartment many times before and it was undisputed at trial that he had been in her apartment as recently as Thursday, March 26, 1987. *Id.* at 240.

[3] However, another officer who interviewed Rivas that day, Frank Pieklik, testified at a pretrial motions hearing that Rivas "appeared, as I recall, quite normal." Transcript of Feb. 24, 1993, Hearing ("Pretrial Hearing Tr.") at 30 (Feb. 24, 1993).

During the interview, Rivas told the police that he had last seen Hill four days earlier, on the evening of Thursday, March 26, 1987, when he had gone to her house and talked to her for half an hour. *Id.* at 240. He had also driven by Hill's apartment at 2:00 p.m. the following day, Friday, March 27, and again approximately four hours later, at 6:00 p.m. He claimed he did not linger on either occasion after discovering that Hill was not home. *Id.* at 240–41. Rivas said that he had spent most of Friday evening with friends at various bars in Syracuse and Cazenovia. *See* Trial Exh. 1. He stated that he was at Coleman's Bar ("Coleman's") in Syracuse from about 6:00 to 11:00 p.m. He then went to Albert's Bar ("Albert's") in Cazenovia and stayed there until 2:00 a.m., before returning to Syracuse to get breakfast at an all-night diner. He finally went home and fell asleep at 4:00 a.m. Rivas claimed that he awoke at 11:30 a.m. on Saturday and returned to Albert's to do some plumbing work. He remained for lunch and then went home to take care of some yard work. He then returned to Albert's to watch Syracuse compete in the "Final Four" of the NCAA Men's Basketball Tournament. He remained at Albert's until approximately 8:00 p.m., whereupon he went to a party at a friend's house until 4 a.m. on Sunday, March 29, before returning home to bed. As Rivas stated in the interview, many people saw him and spoke with him on Saturday night. *Id.*.

While Rivas was being questioned at the station, other police officers put together an application for a warrant to search his residence. Attached to the application was an affidavit signed by Officer Timothy Phinney, attesting that there was probable cause to believe that several items would be found in Rivas's home, including a key to Hill's apartment and clothing soiled with blood, fecal matter, or other contaminants. *See* Motion to Vacate Sentence Pursuant to Criminal Procedure Law 440.10 ("Section 440.10 Mot.") Exhs. 1 & 2. The affidavit also stated that the Onondaga County Medical Examiner, Dr. Erik Mitchell, had preliminarily estimated the time of Hill's death to

7

be "sometime [between] [S]aturday the 28th of March afternoon and [S]unday morning [the] 29th of March 1987." *Id.* Exh. 2.[4]

In the basement of Rivas's house, investigators discovered a damp jacket draped over a clothesline. Trial Tr. 274–75. Although a search of household trash was not expressly contemplated by the warrant, investigators also seized and reconstructed a torn-up note, which they found in a trash bag in Rivas's kitchen.[5] The note was from Hill to another former boyfriend, Bob Lucas, expressing her thanks for their time together. *See* Trial Exh. 5.[6] Finally, inside a bedroom closet, investigators observed what they described as a "shrine," consisting of a large statue of the Virgin Mary surrounded by two smaller candles and a photograph of Hill. Trial Tr. at 270–74, 316.

---

[4] Contemporaneous newspaper articles also reported that Mitchell had estimated the time of death to have been sometime late Saturday night, March 28, to early Sunday morning, March 29. *See, e.g.*, Mike McAndrew, "As Wife Lay Dying, Man Found His Daughter Slain," *The Syracuse Post-Standard*, Apr. 1, 1987, at A1 ("Onondaga County Medical Examiner Erik Mitchell has determined that Hill was strangled late Saturday or early Sunday, Deputy Police Chief Robert Galvin said."); John Doherty, "Police Have No Clues into Slaying of Nurse," *The Syracuse Post-Standard*, Apr. 1, 1987, at B3 ("An autopsy has determined that Valerie J. Hill . . . was strangled to death with the cloth belt of her bathrobe, police said. The report also indicated that she died sometime Saturday or early morning, police said.").

We take judicial notice of "the *fact* that press coverage contained certain information, without regard to the truth of [its] contents." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

[5] Rivas later argued that the note had been recovered from Hill's apartment and not his. *See* Mem. Supp. § 440.10 Mot. at 34.

[6] The note was admitted at trial over Rivas's objection. On direct appeal, the Appellate Division of the New York Supreme Court held that the note should have been suppressed because it was not within the scope of the warrant and did not fall under the "plain view" exception, but that its improper admission at trial constituted harmless error. *See People v. Rivas*, 626 N.Y.S.2d 640, 641 (4th Dep't 1995). Because in reviewing a claim of actual innocence we consider "all the evidence . . . without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *House*, 547 U.S. at 538 (internal quotation marks omitted), we need not ignore the contents of the note.

Although photographs were taken of the trash bag that contained the note, as well as other items in Rivas's house, no photograph was taken of the "shrine." *See id.*

Despite a thorough investigation, neither Rivas nor anyone else was charged with, or even publicly identified as a suspect in, Hill's murder, which remained a "cold case" for five years.

## B.    The Indictment of Hector Rivas

In January 1992, William J. Fitzpatrick was sworn in as District Attorney of Onondaga County, having previously served in that office as an Assistant District Attorney. According to his biography on the Onondaga County District Attorney's website, when he was Chief Assistant District Attorney, "Fitzpatrick specialized in re-opening cases that had previously been considered inactive and, with the cooperation of various police agencies in Onondaga County and the state of New York, he brought numerous killers to justice in cases that were thought to be un-winnable." *See* "Meet the DA," Office of the Onondaga District Attorney, www.ongovda.net/section/meet_the_da/ (last visited May 30, 2012).

On November 22, 1992, nearly six years after the murder of Valerie Hill, a grand jury indicted Rivas on charges of murder in the second degree and aggravated sexual abuse. It is not clear what, if any, new evidence might have come to light that would lead authorities to pursue, and the grand jury to indict, Rivas nearly six years after the murder. In its Bill of Particulars, responding to a defense request for the date when Rivas was first identified as a possible perpetrator of the crime, the prosecution stated, simply: "It is very difficult to respond to this request. Defendant was indicted in November 1992." *See Rivas v. Fischer*, No. 01-cv-1891, (N.D.N.Y. Sept. 18, 2009), ECF No. 55-2 at 56 (Answering Affidavit).

Rivas contends that, sometime after becoming District Attorney, Fitzpatrick approached Mitchell, the medical examiner, and requested that he review Hill's autopsy report with an eye

9

toward expanding the time of death to include Friday, March 27, 1987, when Rivas's alibi was not as strong. According to Rivas, at the time this alleged request was made, Mitchell "was under criminal investigation by DA Fitzpatrick's office, as well as by the Department of Health and the Department of Environmental Conservation" for varieties of misconduct, including improper disposal of waste and stealing and mishandling of body parts. Appellant's Br. at 8.

The State concedes that Mitchell was accused of various forms of misconduct as early as 1989, *see* Appellee's Br. at 24, and does not dispute that he was under investigation by the State Department of Health at the time he testified against Rivas. It is also undisputed that Mitchell resigned his office in November 1993, in part to avoid prosecution by the District Attorney's Office. *See* Remand Hearing Tr. at 205.[7] It is not clear from the record, however, at what point the District Attorney's Office opened its criminal investigation into Mitchell's conduct.[8] Though Rivas's state post-conviction attorneys submitted requests under New York's Freedom of Information Law

---

[7] Mitchell's decision to resign was widely reported in the local newspapers. *See, e.g.*, John O'Brien & Todd Lightly, "DA: Mitchell 'Went Too Far': Medical Examiner, Accused of Mishandling Body Parts, Quits Under Pressure," *The Syracuse Post-Standard*, Nov. 20, 1993, at A1 ("Thursday, Fitzpatrick told Mitchell's lawyer that if Mitchell resigned, the criminal investigation would end."). In the separate investigation by the State Department of Health, Mitchell was later cleared of wrongdoing. *See* Jim O'Hara, "Ex-Medical Examiner Cleared of Wrongdoing: Mitchell was Accused of Improperly Harvesting Body Parts," *Syracuse Post-Standard*, Nov. 16, 1995, at B1.

[8] The investigation was triggered when two subordinates publicly accused Mitchell of misconduct. These self-styled "whistleblowers" submitted statements that were included in the record of Rivas's initial appeal to this Court. One subordinate claimed to have witnessed Mitchell "slant the interpretation of evidence and/or exclude evidence to serve his predetermined objectives," and averred that "Dr. Mitchell's opinions and interpretations of evidence cannot be trusted as impartial or accurate." Aff. of William R. Sawyer at 5–7 (quoted in Joint App'x at 337 n.7). Another—who was himself fired at the same time Mitchell resigned, and later had his medical license revoked for persistent drug and alcohol abuse—claimed that Mitchell had instructed him to fashion his autopsy reports in a way that would allow for manipulation of the case findings and had remarked that "the medical examiners worked for Onondaga County and were there to serve the needs of the District Attorney's Office." Letter of David A. Rigle at 16, (quoted in Joint App'x at 337 n.7).

10

requesting information regarding the investigation, the County provided only one page (a press release) in response, stating that other materials were non-final agency records and attorney work product. *See* Remand Hearing Tr. at 208. Rivas's attorneys also persuaded a state Supreme Court justice to conduct an *in camera* review of the County's investigation of Mitchell in 1998, but the judge determined that the documents would not be provided to Rivas.[9]

In any case, whether it was out of an "eager[ness] to please the prosecutor," Appellant's Br. at 5, as Rivas suggests, or based upon an independent reevaluation of the medical record, it does appear that sometime in 1992, Mitchell reconsidered his estimate of the time of death. The grand jury's indictment alleges that Rivas killed Hill "on or about" Friday, March 27, 1987. The State has identified no new evidence that came to light between March 1987 and November 1992 that led to the indictment.[10] As far as the record reflects, therefore, the only thing that changed during that span of time was the medical examiner's estimation of the time of death.

## C.    The Trial of Hector Rivas

Rivas was tried before a jury in March 1993, with now-deceased Onondaga County Court Judge J. Kevin Mulroy presiding. He was represented by Richard J. Calle, an attorney then practicing in Queens, New York. Rivas, who had moved downstate, hired Calle because Calle happened to be representing him in a civil arbitration matter in the fall of 1992, around the time the District Attorney's Office renewed its investigation of him in connection with Hill's murder. *See* Section

---

[9] The judge did, however, inform one of Rivas's attorneys that Fitzpatrick was scheduled to attend a meeting with a legislative committee regarding allegations against Mitchell on April 13, 1993, just over two weeks after the conclusion of Rivas's trial. *See* Remand Hearing Tr. 117–19.

[10] It appears that the only new evidence prosecutors employed at Rivas's trial was the testimony of a former friend, who stated that Rivas made an incriminating statement to the effect that he "didn't mean to do it" shortly after Hill's death. *See* Trial Tr. at 816–17. However, prosecutors evidently did not learn of this alleged statement until after the indictment was returned, when the witness's girlfriend came forward. *See id.* at 828–29.

440.10 Hearing Tr. at 11. Calle did not work out of a formal business office and, on the occasions that he met with Rivas prior to Rivas's incarceration, those meetings were typically held in Rivas's sister's apartment or at a local diner.[11]

### 1. The People's Direct Case

The People's case was almost entirely circumstantial.[12] District Attorney Fitzpatrick, who tried the case himself, presented Rivas as an obsessive, jilted lover who harassed Hill following their breakup and was pushed over the edge when he learned that Hill was planning to take a trip to the Bahamas alone. Trial Tr. at 1127–28. As Fitzpatrick summarized: "Hector Rivas stalked this woman [for] two and a half months, and finally strangled her and killed her in a jealous rage on March the 27th of 1987." *Id.* at 1069.

Trial testimony and exhibits supported at least part of this theory. Friends of Hill testified that Rivas persisted in contacting Hill on a regular basis, even after she had made clear that she did not want to continue or revive their relationship. In addition, the prosecution introduced dozens of notes, cards, and letters that Rivas had written to Hill in the months between their breakup and her death. *See id.* at 1092–97. Police investigators also testified regarding Rivas's strange behavior when he was first questioned, including his lack of reaction when he was told that Hill had died. *Id.* at 247.

Several witnesses testified regarding Rivas's whereabouts on Friday, March 27, 1987, the alleged date of the murder. Taken together, the testimony of these witnesses suggested that there may have been a window of time during which Rivas could have gone to Hill's house and strangled

---

[11] Calle was later indicted and convicted on federal charges of obstruction of justice and mail fraud unrelated to his representation of Rivas. He was disbarred from the practice of law in New York State nine years after Rivas's trial. *See In re Calle*, 749 N.Y.S.2d 528 (1st Dep't 2002).

[12] Several of Rivas's fingerprints had been found on several items in Hill's house, including on a bottle of wine. However, the prosecution acknowledged at trial that Rivas had been in the apartment many times before, including in the week prior to Hill's death.

12

her while en route from Coleman's in Syracuse to Albert's in Cazenovia, about thirty minutes away. Prosecution witnesses testified that Rivas left Coleman's at around 9:00 or 9:30 p.m. and did not arrive at Albert's until sometime between 11:00 p.m. and 12:30 a.m. *Id.* at 461–63, 439–40, 849. One witness, a clerk at a liquor store near Hill's apartment, testified that he saw Rivas enter the store between 9:30 and 10:00 p.m. *Id.* at 496–99. Two witnesses testified that they observed Rivas smoking a cigarette in his car, which was parked outside Hill's house, sometime between 11:00 p.m. and 12:00 a.m. that night—around the time that the prosecution theorized Hill was murdered. *Id.* at 533–34, 936–37.[13]

Beyond making the case that Rivas had motive and the opportunity to murder Hill on Friday night, Fitzpatrick deftly turned Rivas's alibi for Saturday against him. Through witness testimony and in his opening and summation, Fitzpatrick suggested that Rivas had contrived to be seen by many people at all hours of the day Saturday and into Sunday morning, so that he would have an alibi in the event that police focused on Saturday evening as the time of death. *See, e.g., id.* at 1084, 1124. For example, Elizabeth Lewis, one of Hill's friends, testified that Rivas sought her out at a party Saturday evening and remarked that "[i]t's too bad Valerie's not feeling well, that she can't be here tonight." *Id.* at 780. The implication, according to the prosecution, was that Rivas wanted to plant the idea in Lewis's mind that Hill was alive on Saturday evening, knowing that he was at that very moment cementing his alibi. *See id.* at 1124.[14]

---

[13] One of these witnesses, Hill's upstairs neighbor, was in fact called by Rivas as a defense witness, apparently because she had initially told police that she had seen Hill in their shared basement on Saturday morning, March 28. However, under cross examination by Fitzpatrick, she readily conceded that she was mistaken in her initial statement to police and had in fact seen Hill on Friday morning, March 27. Trial Tr. 928–29, 932.

[14] Lewis did not testify that Rivas claimed to have spoken to Hill on Saturday. However, it was her sense, six years later, that he was trying to convey the impression that he had. This

13

Similarly, Fitzpatrick emphasized a seemingly exculpatory item of evidence: a Stephen King novel that Hill had checked out from the Cazenovia Public Library, and which a witness had seen in the back seat of Hill's car on Friday afternoon. *See id.* at 190–91. The book was returned to the library's drop box sometime between Saturday afternoon and Sunday morning, suggesting that Hill (the most likely person to have returned it) was alive at least as late as Saturday afternoon. But Fitzpatrick theorized that it was Rivas who returned the book, hoping that it would cause investigators to believe that Hill was not killed on Friday night, when his alibi was relatively weaker. *Id.* at 54–55, 1085.[15]

Finally, the People elicited testimony from Joe Fields, an acquaintance of Rivas, who encountered him at Albert's bar approximately three weeks after the murder. Rivas had been drinking heavily and was crying over Hill's death. According to Fields, at a moment when Rivas did not know that Fields was in earshot, he said to himself, "Valerie, Valerie, I didn't mean to do it." *Id.* at 817–18.

### 2.      The Medical Examiner's Testimony

No matter how much circumstantial evidence the prosecution could amass tending to link Rivas to the crime, however, it had no case unless it could prove that Hill died on Friday night. Fitzpatrick himself acknowledged that Rivas's alibi was "complete—for Saturday night." *Id.* at 55. Indeed, it was the People's position that Rivas's alibi was so strong on Saturday night precisely

---

purported plan backfired, because Lewis—unlike Rivas—knew that Hill was planning to be out of town that weekend. Rivas's comment therefore struck her as odd. Trial Tr. 780.

[15] As Rivas pointed out in his state collateral motion, however, Hill had requested the book through an interlibrary loan and all of the markings on the book indicated it was from a different library, in Utica. Thus, Rivas (belatedly) argued, only Hill would have known to return it to Cazenovia library and not the original library. Furthermore, although the prosecution's fingerprint expert examined the book and found three prints that he could not identify, he apparently did not recover any of Rivas's prints from the book. *See* Trial Tr. at 588.

14

because he had concocted it, having murdered Hill the night before. Therefore, the prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on Saturday as Mitchell had initially determined.

Mitchell testified that, when he first observed Hill's body on the afternoon of Monday, March 30, it "was in rigor," and that by the time he performed an autopsy later that day, "[s]he was coming out of rigor." *Id.* at 869, 872.[16] He cautioned that no medical examiner can pinpoint with certainty the time of a person's death, *id.* at 886, but stated that, based on his observations of the body, there was nothing inconsistent with Hill having died on either the night of Saturday, March 28, or Friday, March 27. *Id.* at 888. However, taking into account a number of external factors—namely, that Hill's cat was seen outside on Saturday morning; that Hill had not been seen after Friday; that she never contacted the friend whom she intended to visit that weekend; that her car had apparently not been driven since Friday; and that she had not been in touch with her father despite the fact that his wife was gravely ill—Mitchell opined that "it's more likely that she died Friday night, to possibly very early Saturday morning" than on Saturday night. Trial Tr. 889–90. He also stated his opinion "within a reasonable degree of medical certainty" that Hill died as a result of being strangled. *Id.* at 891.[17]

Confronted on cross-examination with contemporaneous newspaper accounts that reported on his preliminary findings, Mitchell admitted that he "[q]uite possibly" had estimated at some point

---

[16] In the "scene investigation" report that Mitchell prepared and signed at the time of his initial inquiry into the cause and time of Hill's death, he reported that he had found Hill's body in "*full* rigor, with fixed anterior livor." *See* Remand Hearing Tr. 75–76 (emphasis added).

[17] Whether by design or oversight, Mitchell did not testify that his opinion on Hill's time of death was "within a reasonable degree of medical certainty." Trial Tr. at 891.

that Hill died late on Saturday night or early Sunday morning. *Id.* at 895–96.[18] Mitchell also conceded that, when he testified before the grand jury in November 1992, he had stated that it was merely "on the outside edge of [ ] possibility" that Hill could have been murdered on Friday night. *Id.* at 907. At trial, however, he insisted that he had never "tied [himself]" to a Saturday night estimate. *Id.* at 895. He stressed that the onset and relaxation of rigor mortis was highly variable and could be slowed, for example, by cold temperatures, *id.* at 905–06. Although Mitchell thus acknowledged that in most cases rigor mortis relaxes within twenty-four to forty-eight hours (which would put Hill's time of death somewhere between Saturday and Sunday afternoon), he suggested that the cool temperatures in Hill's apartment could have retarded the process.

On redirect examination, Mitchell explained that, when he testified before the grand jury several months earlier, he had not reviewed "some of [his] notes and slides." *Id.* at 915. Having had the opportunity to review the "slides" before trial, he noticed in them "some decomposition to the brain." *Id.* This, he stated, "tends to push the [time] limits further out." *Id.*[19]

_____

[18] Although Calle attempted to impeach Mitchell with newspaper articles suggesting that Mitchell had initially estimated the time of death to be Friday night, he did not refer to the police affidavit supporting the application to search Rivas's residence, which stated that Mitchell had preliminarily estimated the time of Hill's death to be "sometime [between] [S]aturday the 28th of March afternoon and [S]unday morning [the] 29th of March 1987," Section 440.10 Mot. Exh. 2. *See* Section 440.10 Hearing Tr. at 98.

[19] Rivas contends that Mitchell committed perjury when he testified that he had examined "brain slides," because the medical examiner's file did not, in fact, contain any such slides. The state concedes that there were no "brain slides"—that is, sectional slides containing actual brain tissue. It argues, however, that there were in fact two photographic slides containing images of Hill's brain, and that Mitchell may have been referring to those slides in his testimony.

We need not, and therefore do not, address Rivas's allegation that Mitchell committed perjury. We note, however, that Fitzpatrick specifically characterized the slides in question as "autopsy sectional slides" in his closing argument. Trial Tr. at 1082–83. Furthermore, Rivas's expert, Dr. Cyril Wecht, has testified that a forensic pathologist would "not use the word slide synonymously with a photograph." Remand Hearing Tr. at 27. In any case, Wecht has also testified

16

3.    Belated Disclosure of Exculpatory Evidence

At the close of the People's case, Fitzpatrick disclosed the existence of an August 1988 affidavit from one Joe Morgan, in which Morgan attested that an individual named Patsy Barricella had admitted to Morgan that he (Baricella) murdered Hill. Trial Tr. at 947–48.[20] Recognizing that this evidence was "exculpatory without a doubt," *id.* at 984, the trial judge allowed Calle, Rivas's attorney, to decide whether to adjourn and attempt to call Morgan or Barricella as witnesses, or instead to bring out the information contained in the affidavits by examining the Syracuse police officer who had interviewed Morgan. Calle opted to draw the information out of the police officer, Michael Ostuni. *Id.* at 987. According to Ostuni, Morgan claimed that he had a conversation with his friend and neighbor Barricella in March 1988, at which time Barricella confessed to killing "the girl on Hickok Avenue." Section 440.10 Mot. Exh. 8. In addition, Barricella had, according to Morgan, driven by the crime scene several times as police were investigating Hill's murder and was stopped by police as a result. (Indeed, a contemporaneous police report revealed that Barricella was stopped by police after driving by the crime scene repeatedly. *See* Section 440.10 Mot. Exhs. 9 & 10.) However, on cross-examination by the District Attorney, Ostuni also testified that Morgan was a con artist and career criminal who had contacted the police from a county jail cell, demanding release as a *quid pro quo* for cooperation. Trial Tr. at 998–1000. Ostuni further testified that Barricella was known to be "mildly mentally retarded." *Id.* at 1001.

---

that, even if Mitchell had examined "brain slides" (that is, sectional slides), such a review is "totally unreliable" as a means of determining the time of death, because the sections of the brain contained in such slides continue to decompose for up to ten days after the brain is placed in a formalin bath for preservation. *See* Aff. of Cyril H. Wecht Supp. Section 440.10 Mot. at 6.

[20] Though it is unclear when Fitzpatrick first became aware of or obtained Morgan's affidavit itself, the trial transcript suggests that he was in possession of at least some documents relating to Morgan before opening statements were made, and thus well before this information was turned over to the defense. *See* Trial Tr. at 65.

### 4. Rivas's Direct Case

Beyond the testimony of Ostuni, Rivas's direct case was underwhelming. As Calle later testified, he did not appreciate at trial that the precise time of Hill's death was important because he felt that Rivas had a strong alibi throughout the entire weekend. He therefore never considered calling an expert forensic pathologist to challenge Mitchell's adjusted findings. *See* Section 440.10 Hearing Tr. at 85, 87. He did attempt to establish that Hill was alive on Saturday by calling a prosecution witness, Hill's upstairs neighbor, to read from an affidavit in which she had stated that she had seen Hill in their shared basement that morning. However, on cross-examination by Fitzpatrick, the witness readily conceded that she had been mistaken in her affidavit and had in fact seen Hill on Friday morning, not the following day. *See* Trial Tr. at 927–932. Calle also attempted to establish Rivas's alibi by calling a single witness who claimed to have seen Rivas at Albert's in Cazenovia as early as 7:30 p.m. on Friday. *Id.* at 967. Finally, he called a witness who testified that Rivas was acting normally on Saturday night. *Id.* at 974. Rivas did not testify in his own defense, and claims that Calle never informed him of his right to do so. Section 440.10 Hearing Tr. at 17–18.

### 5. Summations

In his closing argument, Calle argued that the Hill murder had been solved backwards: The police and the District Attorney's Office had decided at the outset that Rivas was the killer and then set out to find, or fabricate, the proof of the murder from there, ignoring other potential leads along the way. Trial Tr. at 1044. With respect to the time of death, Calle argued that Mitchell had to stretch science beyond the breaking point to opine at trial that it was more likely that Hill had been killed on Friday than on Saturday, when Mitchell had previously testified before the grand jury that a Friday time of death was only "on the outside limits of possibility." *Id.* at 1062. Calle did not explicitly challenge Mitchell's credibility or suggest that he might be beholden to the District Attorney's

18

Office. Indeed, Rivas claims that neither he nor Calle were aware of the investigations into Mitchell's conduct at the time of the trial, despite their widespread publicity in the weeks leading up to the trial, apparently because they both then lived downstate. *See* § 2254 Petition at iv; Remand Hearing Tr. at 271–72.

Fitzpatrick, in his summation, defended Mitchell's estimates:

> [A]s [Dr. Mitchell] told the grand jury, rigor mortis, the stiffening of the body after death, normally begins to pass off within 24 to 48 hours. If we were looking at a calendar, this would put the normal time of death or the normal median time of death sometime Saturday afternoon. Could it have been 16, 17, 18 hours earlier? Absolutely. Absolutely. Heating conditions refer, first of all, to 75 degrees. It wasn't the temperature of the house. The temperature of the house was 62 degrees. . . . Basement underneath her, cold floor. And the nights as you might expect, in March of 1987 were cold as well.

Trial Tr. at 1082–83.[21] Furthermore, Fitzpatrick argued, Mitchell had "had a chance to review autopsy sectional slides of the brain," *id.*, which tended to expand the range of possible times of death. This review, Fitzpatrick claimed, combined with the external indications Mitchell had identified, had led Mitchell to opine that it was most likely that Hill died on Friday, March 27.

Summarizing the evidence against Rivas, Fitzpatrick theorized that Rivas had paid Hill a visit on Friday night after he left Coleman's bar, and had brought over a bottle of rum and a bottle of

---

[21] In fact, the temperature of the apartment was never recorded and Hill was lying on a carpeted floor. The record also reveals that the week of Hill's death was unusually warm. One witness told police that the last time she had seen Hill, Hill was sunbathing in her backyard. Section 440.10 Mot. Exh. 24. Another witness stated that she had her window open late Saturday night, when she heard a woman's scream. *Id.* Exh. 4.

Parenthetically, we note that, according to the National Climatic Data Center, the mean temperature in Syracuse, NY, on March 27, 1987, was 51° Fahrenheit, with a high of 61° and a low of 40°. On March 28, the temperature ranged from 37–65° with a mean of 51°. And on Sunday, March 29, the day before Hill's body was discovered, the high temperature was 74° and the low 36° with a mean of 55°. *See* Local Climatological Data, Monthly Summary for Syracuse, NY, March 1987, *available at* http://www7.ncdc.noaa.gov/IPS/lcd/lcd.html?_finish=0.400803217488396 (last visited July 3, 2012).

wine in hopes that the two could mend their relationship. When he discovered that Hill not only did not want to reunite with him, but was also planning a trip to the Bahamas alone, he flew into a rage and strangled her. Then, realizing he needed to cover up the crime, he got rid of the airline ticket (but left an ashtray full of his cigarettes), and, on the way to his car, took Hill's library book from the back seat of her car, intending to return it the next day to make it appear as though Hill were still alive. He then crafted a tight alibi for the rest of the weekend. *Id.* at 1125–30.

The jury deliberated for eight hours over the course of one day, during which time it asked for further instructions on the meaning of "reasonable doubt." *Id.* at 1188. At approximately 10:45 p.m. on March 25, 1993, nearly six years to the day after Valerie Hill was killed, Hector Rivas was found guilty of second-degree murder. He was subsequently sentenced on May 12, 1993, to an indeterminate term of imprisonment of twenty-five years to life.

## D. State Post-Conviction Proceedings

Rivas, with the assistance of new counsel, appealed his conviction to the Appellate Division of the New York Supreme Court, claiming, *inter alia*, that certain papers seized from his home on March 30, 1987—including the torn-up note from Hill to her former boyfriend—should have been suppressed; that police testimony regarding his statements and demeanor during his interrogation should have been excluded; that he was deprived of a fair trial by the belated disclosure of the Joe Morgan affidavit; and that the verdict was against the weight of the evidence. On April 28, 1995, the Appellate Division issued a decision unanimously affirming Rivas's conviction. *People v. Rivas*, 214 A.D.2d 996 (4th Dep't 1995). Although the Appellate Division held that the note should have been excluded, it concluded that admission of the evidence was harmless. *Id.* at 996. The panel rejected the remainder of Rivas's claims on appeal. *Id.* at 996–97. Rivas's application for leave to appeal to

the New York Court of Appeals was denied on August 15, 1995. *People v. Rivas*, 86 N.Y.2d 801 (1995) (table).[22]

Thereafter, with the assistance of yet another lawyer, Rivas filed a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10, which provides the means of collateral attack on a criminal judgment in New York state courts. In that application, Rivas alleged that he had been the victim of a "concerted effort to convict that was severed from concerns over actual guilt very early on in this investigation and was orchestrated by the District Attorney himself, William J. Fitzpatrick, who personally prosecuted this case." Affirmation of H. Mitchell Schuman in Support of Section 440.10 Mot. at 3.

Principal among Rivas's allegations was that Mitchell, the medical examiner, had altered his original estimate of the time of Hill's death in order to satisfy the District Attorney in hopes of avoiding prosecution for alleged criminal misconduct. *Id.* at 4–7. Rivas claimed not to have known about the investigation of Mitchell and his office until after the trial, when Mitchell was indeed forced to resign to avoid prosecution by Fitzpatrick's office. *Id.* at 6. Additionally, Rivas claimed to have discovered only after the trial that, despite Mitchell's testimony that he had examined "slides" in coming to the conclusion that Hill most likely died on the night of Friday, March 27, 1987, and despite Fitzpatrick's characterization of these slides in his summation as "autopsy sectional slides," there were in fact no sectional slides of Hill's brain in the medical examiner's file. *Id.* at 6–7.

Rivas also pointed to "new evidence," in the form of an affidavit by Dr. Cyril H. Wecht, an expert in forensic pathology, who attested that Mitchell's calculations of the cause of death were "misguided," and that, in his expert opinion, "based upon a reasonable degree of medical certainty,

_____

[22] Rivas also filed an application for a writ of error *coram nobis*, which was denied by the Appellate Division on September 27, 1996. *People v. Rivas*, 647 N.Y.S.2d 648 (4th Dep't 1997) (Table).

21

. . . the length of time between the death of Valerie J. Hill and the time she was found was less than 48 hours, *and more likely less than 36 hours*." Affirmation of Cyril H. Wecht in Support of Section 440.10 Mot. (emphasis in original). In other words, according to Wecht, Hill most likely died between 3:30 p.m. on Saturday, March 28, and 3:30 a.m. on Sunday, March 29.

In addition, Rivas alleged that a significant amount of exculpatory material was withheld from the defense at trial. Most saliently for our purposes, Rivas claimed that he never received an affidavit taken from one of Hill's neighbors, Mary Lazarski, and a police report memorializing an interview with another unnamed neighbor. In her affidavit, Lazarski attested that, late in the evening of March 28 or early in the morning of March 29, while she was watching "Saturday Night Live" on television, she heard through her open window "a loud shriek or scream [that] seemed to cut off." Section 440.10 Mot. Exh. 4. She stated that "[t]he voice was a woman's voice and it sounded like someone was in trouble and not like anyone kidding around." *Id.* Lazarski's husband also signed an affidavit confirming that his wife woke him up and told him about the incident that night. *Id.* The unidentified neighbor told police that he heard a dog barking and a car speed away from the vicinity of Hill's house at around 11:00 Saturday night. *Id.*

Beyond these documents, Rivas claimed that the prosecution failed to disclose: (1) a police report regarding an interview with a neighbor who had seen Hill intimately embracing a man other than Rivas a few days prior to her murder, and another interview stating that Hill had been involved in an intimate relationship with a man other than Rivas at the time of her death; (2) information that one of Hill's neighbors had previously been arrested for burglary and was known to peer through windows in the neighborhood;[23] (3) information that an employee at the hospital where Hill worked

---

[23] This neighbor appears to have been a member of the family who lived upstairs from Hill at 250 Hickok Avenue. The individual was interviewed by police in connection with Hill's murder and admitted to having been arrested and charged in 1985 with a burglary of 248 Hickok Avenue, the

22

had been disciplined after Hill made a complaint against him; (4) information regarding a purported "sexual deviant" who was residing in Hill's neighborhood; (5) the fact that one of the prosecution witnesses had a prior conviction; and (6) the affidavit stating that Patsy Barricella, not Rivas, had committed the crime. Section 440.10 Mot. at 7–10.

Finally, Rivas raised a claim of ineffective assistance of counsel, alleging that his trial attorney, Calle, had failed to apprise him of his right to testify in his own defense, and had failed to "investigate or challenge the false and misleading testimony given by the medical examiner at trial." Mem. Law. Supp. Section 440.10 Mot. at 34–40.

On April 7, 2000, Acting Onondaga County Supreme Court Justice John J. Brunetti conducted an evidentiary hearing in connection with Rivas's § 440.10 motion. At the close of the hearing, Justice Brunetti issued an oral ruling denying relief with respect to Rivas's *Brady* claims and one portion of his ineffective-assistance claim, finding that Rivas had not borne his burden of persuasion on those points. *See* Section 440.10 Tr. at 135–41. After taking the remaining issues under advisement and receiving post-hearing briefs from the parties, Justice Brunetti issued a written decision on September 8, 2000, denying relief on the remaining claims. *See People v. Rivas*, No. 92-2794 (N.Y. Sup. Ct. Sept. 8, 2000).

---

apartment later occupied by Hill. (He was ultimately convicted of petit larceny, according to the report.) When questioned about his whereabouts the weekend of Hill's death, he mentioned having "pass[ed] by his parents house at 250 Hickok Avenue." Section 440.10 Mot. Exh. 18. Although it appears that the individual had an alibi for the relevant time period, the very fact that he was questioned by police and had previously been arrested for suspicious criminal activity involving Hill's apartment, if disclosed to the defense, would likely have provided grounds for challenging the credibility of his family members, who testified against Rivas.

## E.    Federal Habeas Proceedings

### 1.    *Initial Decision and Appeal*

On December 12, 2001, Rivas filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In it, he raised substantially the same claims that he had advanced before the state court in his § 440.10 motion. Principally, he claimed that: (1) he was entitled to a new trial in light of newly discovered evidence of misconduct and false testimony by the medical examiner; (2) the prosecution failed to provide him with *Brady* material; and (3) his trial counsel was grossly ineffective. § 2254 Petition at i–ii.

The District Court dismissed Rivas's claims as time-barred under 28 U.S.C. § 2244(d). *See Rivas v. Fischer*, No. 01-cv-1891, ECF No. 21 (N.D.N.Y. Jan. 28, 2005) ("*Rivas I*"). By summary order dated October 2, 2008, we vacated the judgment of the District Court, concluding that we were unable to review its determination that the petition was untimely because it had not developed a record as to whether a duly diligent person in Rivas's circumstances would have been able to discover the factual predicates for his claims more than a year prior to his filing the petition. We therefore remanded the cause to the District Court with instructions that it "make specific factual findings" regarding the timeliness of Rivas's claims, noting that, in order to be timely, Rivas's claims must not have been discoverable through the exercise of due diligence prior to May 8, 1999, one year prior to the actual filing of his petition (not including periods of time during which the statute of limitations was tolled). *See Rivas II*, 294 F. App'x at 679.

In addition, we instructed that, should the District Court determine that Rivas had not satisfied the requirements of § 2244(d)(1)(D), it "should then make specific findings as to whether Rivas has established a credible claim of actual innocence" under applicable Supreme Court and Second Circuit standards. *Rivas II*, 294 F. App'x at 679. We specifically stated that "the District

24

Court may wish to examine the 'likely credibility of the affiants,'" namely Wecht and Calle, and "the relative strength of the State's case against Rivas in light of any credibility determinations that the District Court sees fit to make." *Id.*

2.    *Proceedings on Remand*

Pursuant to our remand order, an evidentiary hearing was conducted by Magistrate Judge David Peebles on September 21 and 22, 2009.[24] The magistrate judge opened the hearing by expressing his view that, "although actual innocence is at play, the primary focus [of the hearing] is on the timeliness question"—that is, whether the "new evidence" upon which Rivas purported to base his claims was known, or could have been discovered through the exercise of due diligence, prior to May 8, 1999. Remand Hearing Tr. at 9.[25] Much of the testimony at the hearing before the magistrate judge therefore focused on the efforts of Rivas and his attorneys to track down the information underlying his claims.

The Court did, however, hear testimony from Wecht, the forensic pathologist whose affidavit called into doubt Mitchell's time-of-death estimate. Wecht testified that he had reviewed the medical examiner's file, as well as the relevant trial testimony, and concluded "with a reasonable degree of medical certainty," that "this death could not have occurred longer than 48 hours prior to

---

[24] At the start of the hearing, the magistrate judge disclosed that, like Judge Mulroy, who presided over Rivas's trial, he had served with Fitzpatrick in the Onondaga County District Attorney's Office, and that (again like Judge Mulroy) he had selected Fitzpatrick to be the godfather of his daughter. However, he felt that this relationship—which had apparently become less familiar over time—would not prevent him from fairly adjudicating the case. Rivas did not seek his recusal. *See* Remand Hearing Tr. at 3–5.

[25] Indeed, the magistrate judge refused, for example, to admit evidence relating to the results of DNA tests on items taken from Hill's apartment that purportedly included only one "match" to Rivas, stating "I have already made it clear I'm not retrying the murder case." Remand Hearing Tr. at 114.

25

the time that Mitchell examined the body on Monday, March 30 at 3:30 p.m." *Id.* at 36.[26] Wecht arrived at this conclusion primarily because Mitchell had written in his scene investigation report that the body was in "full rigor" when he examined it and a body generally cannot remain in "full rigor" more than forty-eight hours after death. *Id.* at 33–34; *see* note 13, *ante.*[27] Furthermore, Wecht noted that the autopsy report contained no reference to discoloration around the abdominal wall, which would generally be found in a body that has been lying face-down on the ground for longer than forty-eight hours. *Id.* at 34–35.

Wecht further testified that the reasons Mitchell had provided at trial for "push[ing] the time limits further out" were without scientific basis. With respect to Mitchell's claim that cool temperature conditions in Hill's apartment could have delayed the onset and relaxation of rigor, Wecht testified that, though a colder environment may slow down the development of rigor mortis, the temperature in Hill's apartment could not have been low enough to make a difference:

> Now if you have a particularly cold weather as you can have in Syracuse in the wintertime, that's a different matter, a body found in your snowy mountains, but not a body, I don't care if it's 60 to 62 degrees or 70 degrees, not going to make any difference. You're not going to have a body in full rigor 48 hours after the person has died. You're just not going to have that.

*Id.* at 34. With respect to Mitchell's claim that he had observed decomposition in Hill's brain when he examined "slides" in his file, Wecht testified that such decomposition could not be observed in

---

[26] Wecht clarified that, in his opinion, Hill "most likely [died] within 36 hours prior to [the afternoon of March 30, when Mitchell first examined her body] . . . [but] that being extremely liberal so to speak in terms of ascertaining a time of death that you might take it back as much as about 48 hours or so." *Id.* at 26–27.

[27] Wecht stated that he could not recall ever having encountered a body in full rigor more than forty-eight hours after death, nor had he ever heard of such a case. *Id.* at 76.

26

photographic slides, but only in sectional slides, containing actual brain tissue.[28] Inasmuch as there were no sectional slides in the medical examiner's file, and inasmuch as the neuropathologist who in fact examined Hill's brain had found no evidence of external decomposition, Wecht opined that Mitchell's trial testimony in this regard was unfounded. *See* Remand Hearing Tr. 27–28, 31.

Overall, Wecht found Mitchell's explanation for expanding the possible time of death to include Friday to be unsound, and perhaps improper. He stressed that "any forensic pathologist in the world" would agree that an estimation of time of death is more reliable if made at around the time of the autopsy, and stated that Mitchell's claim that he could "come back in six years later and say that now I have a new estimate" was, at best, "a misrepresentation." *Id.* at 37–38.

On cross-examination, Wecht allowed that it was possible that Hill could have died as early as 9:30 a.m. on Saturday, March 29. The attorney for the State then asked if it would have been "impossible for Hill to have died at 2:30 a.m. on Saturday morning," to which Wecht offered the following response:

> You know, I am always very hesitant to use words like absolute and impossible . . . but I'll answer with reasonable medical probability or reasonable medical certainty, I do not believe that Ms. Hill could have been killed as far back as 2:30 a.m. on Saturday morning, August 28th, that is after midnight on Friday, the 27th into the morning hours of Saturday, the 28th.

*Id.* at 64–65.[29] Notably, the State did not challenge Wecht's credibility or expertise as a forensic pathologist or offer any expert testimony of its own.

---

[28] Even observation of sectional slides is not a reliable means of determining the *time* of death, according to Wecht, because the pieces of the brain contained in sectional slides continue to decompose for approximately ten days after the brain is placed in a formalin bath for preservation. *See* Aff. of Cyril H. Wecht Supp. Section 440.10 Mot. at 5.

[29] In any case, Rivas had an alibi for 2:30 a.m. Saturday morning. Prosecution witnesses testified that he arrived at Albert's in Cazenovia between 11:00 p.m. Friday and 12:30 a.m. Saturday and his alibi was unchallenged for the remainder of Saturday. *See* Trial Tr. at 461–63, 439–40.

After the hearing, and upon receiving briefs from the parties, the magistrate judge issued a Report and Recommendation recommending that the petition again be dismissed as untimely. *See Rivas v. Fischer*, No. 01-cv-1891, 2010 WL 1257938 (N.D.N.Y. Jan. 8, 2010) ("*Rivas III*"). He found that Rivas had "established neither that he did not and could not have discovered the evidence serving as the factual predicate for his claims, through the exercise of due diligence, more than one year before his petition was filed, excluding any intervening tolling periods, nor a colorable claim of actual innocence[.]" *Id.* at *1.

With respect to timeliness, the magistrate judge concluded that the investigation into Mitchell's misconduct as medical examiner was public knowledge at the time of the trial and therefore could have been discovered well in advance of May 8, 1999, the latest date on which Rivas's § 2254 petition could have been timely filed. *Id.* at *10–11.[30] Regarding Wecht's June 9, 1999, affidavit casting doubt on Mitchell's testimony, the magistrate judge concluded that it was not in fact "new evidence," but instead was "nothing more than a conflicting opinion to that of Dr. Mitchell regarding the time of the victim's death." *Id.* at *11. The magistrate judge did not make any finding regarding when a duly diligent person would have discovered the factual predicates for Rivas's *Brady* claims, concluding instead that Rivas had failed to establish that the material in question was actually withheld from the defense. *Id.* at *13–14. As a result of an apparent oversight, the magistrate judge did not address Rivas's claim of ineffective assistance of trial counsel.

With respect to actual innocence, the magistrate judge concluded, without elaboration or citation to the record, that the new evidence Rivas proffered "could [not] properly be characterized as the type of highly reliable evidence upon which a claim of actual innocence could be predicated."

---

[30] The magistrate judge also concluded that the evidence relating to the Mitchell investigation was "not of a character which would have altered the jury's verdict," because it did not include evidence that Mitchell falsely testified at trials. *Id.*

28

*Id.* at *15 n.23. Addressing the affidavit and testimony of Wecht, which he deemed the "centerpiece of petitioner's actual innocence claim," the magistrate judge noted that Wecht had "conceded on cross-examination that Hill's death could have occurred as early as four to six hours prior to [3:30 p.m. on Saturday, March 28, 1987] . . . *and he was unable to state with absolute certainty* that she could not have died late Friday night into the early morning hours of Saturday, March 2[8], 1987." *Id.* at *15 (emphasis added). Therefore, in the magistrate judge's view, Wecht had not absolutely ruled out the possibility that Mitchell was correct in estimating the time of death at Friday, March 27, 1987. Importantly, the magistrate judge did not make any adverse credibility finding with respect to Wecht's affidavit and testimony. Rather, in light of what he deemed to be "overwhelming" evidence of Rivas's guilt, the magistrate judge concluded that "Dr. Wecht's testimony does not rise to a level sufficient to permit the conclusion that no reasonable juror could have found guilt beyond a reasonable doubt had the additional evidence been considered." *Id.* at *16.

Rivas filed timely objections to the Report and Recommendation. After further briefing from both sides, Judge Sharpe, upon *de novo* review, adopted the magistrate judge's Report and Recommendation and dismissed the petition without reaching the merits. *See Rivas v. Fischer*, No. 01-cv-1891, 2010 WL 1257935 (N.D.N.Y. Mar. 26, 2010) ("*Rivas IV*"). The District Court granted a certificate of appealability "limited to the issue of when petitioner discovered the new evidence that serves as a factual predicate for some of his claims, and whether it could have been discovered earlier through the exercise of due diligence." *See id.* at *5 (granting certificate of appealability as articulated by Magistrate Judge Peebles in *Rivas III*, 2010 WL 1257938 at *17).[31] This appeal followed

---

[31] Though the certificate of appealability was limited to the issue of when the factual predicates for Rivas's claims could have been discovered through the exercise of due diligence, Rivas's notice of appeal states that it is "from each and every part" of the District Court's judgment. Notice of Appeal, *Rivas v. Fischer*, No. 10-1300-pr (2d Cir. Apr. 8, 2010), ECF No. 1. We construe the notice of appeal as a request to amend the certificate of appealability to reach the issues of

and was assigned to the original panel, pursuant to the instructions in our prior summary order. *See Rivas II*, 294 F. App'x at 680 (invoking the remand procedure outlined in *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994)).

## DISCUSSION

The merits of Rivas's habeas petition are not at issue in this appeal. Rather, our concern is only with whether the petition was timely filed and, if the petition was untimely, whether Rivas's delay in filing it should be excused.

Among the reforms instituted by Congress in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is a one-year statute of limitations, 28 U.S.C. § 2244(d)(1), which runs from the latest of a number of triggering events, including "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," *id.* § 2244(d)(1)(A), and "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," *id.* § 2244(d)(1)(D). *See* note 1, *ante*. Petitioners, like Rivas, whose convictions became final before the enactment of AEDPA on April 24, 1996, are entitled to a one-year "grace period," meaning that their petitions would not be barred if filed on or before April 24, 1997. *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998).

Rivas does not dispute that his federal habeas petition, filed December 12, 2001, would be untimely under § 2244(d)(1)(A), but argues here (as he did before the District Court) that it should nevertheless be considered timely under § 2244(d)(1)(D) because it is predicated on new evidence which could not have been discovered more than a year prior to his filing (excluding the period

---

equitable tolling and actual innocence, and we grant that request. *See Saunders v. Senkowski*, 587 F.3d 543, 547 (2d Cir. 2009) (amending certificate of appealability to reach issue of timeliness, where certificate was granted only on issue of equitable tolling); Fed. R. App. P. 22(b)(2) (authorizing court of appeals to construe a notice of appeal as a request for a certificate of appealability).

during which his state post-conviction motion was pending). He also argues that, even if the petition was not timely filed under § 2244(d)(1)(D), he should benefit from equitable tolling, because it was only due to ineffective assistance rendered by his trial and initial post-conviction counsel that he failed to file sooner. Finally, he argues that the merits of his petition should be considered irrespective of the statute of limitations because he has made a compelling showing of actual innocence. The District Court rejected each of these arguments and dismissed the petition as untimely.

We consider the District Court's treatment of each issue in turn, reviewing its factual findings for clear error and its legal determinations *de novo. See Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009).

## A.     Timeliness Under § 2244(d)(1)(D)

Although Rivas raises six claims in his habeas petition, the claims that are allegedly predicated on new evidence fall into three categories: (1) the claims relating to the alleged misconduct and false testimony of the medical examiner, Mitchell; (2) the *Brady* claims; and (3) the ineffective-assistance-of-counsel claims. We have previously explained that, in order for Rivas's petition to be deemed timely under § 2244(d)(1)(D), he must show that the factual predicates for these claims could not have been discovered through the exercise of due diligence before May 8, 1999. *See Rivas II*, 294 F. App'x at 678. We arrived at this date by working backward from the date on which Rivas in fact filed his petition:

> Three hundred days of the one-year limitations period elapsed between the final denial of Rivas's state post-conviction motion (February 15, 2001) and the date on which he filed his federal habeas petition (December 12, 2001). From July 12, 1999 until February 15, 2001—the period during which Rivas's state post-conviction motion was pending in state court—the limitations period was tolled. Counting back sixty-five days from the date when Rivas filed his state post-conviction petition (July 12, 1999) yields May 8, 1999.

31

*Id.* at 678. Accordingly, if the "newly discovered" evidence on which Rivas's claims are predicated could in fact have been discovered prior to May 8, 1999, then the petition, filed December 12, 2001, is untimely under § 2244(d)(1)(D).

The determination of the date on which the factual predicate for a habeas claim is first discoverable is a "fact-specific" inquiry which requires a district court to analyze the factual bases of each claim and to determine when the facts underlying the claim were known, or could with due diligence have been discovered. *See Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000) (addressing the parallel requirement in the statute governing habeas petitions challenging federal convictions, 28 U.S.C. § 2255(f)(4)). Because the inquiry into when a factual predicate could have been discovered with due diligence is, by definition, a question of fact, we review the District Court's determination for clear error. *See Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005) ("The ultimate question whether a petitioner exercised due diligence is one of fact which we will set aside only if it is clearly erroneous[.]"); *see generally Drake*, 553 F.3d at 239.

Congress did not provide a definition of the term "factual predicate," as used in § 2244(d)(1)(D); nor have we previously had occasion to offer one. Those courts that have given meaning to the term agree that a factual predicate consists only of the "vital facts" underlying the claim. *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007); *see also Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998). We agree. The facts vital to a habeas claim are those without which the claim would necessarily be dismissed under Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (requiring a district judge to dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief") or Rule 12(b)(6) of the Federal Rules of Civil Procedure (allowing for dismissal of a civil complaint where the plaintiff has "fail[ed] to state a claim upon which relief can be granted").

32

Accordingly, if new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a "factual predicate" for purposes of triggering the statute of limitations under § 2244(d)(1)(D). *See McAleese*, 483 F.3d at 214 (observing that the petitioner had "confused the facts that make up his claims with evidence that might support his claims"); *Escamilla v. Jungwirth*, 426 F.3d 868, 871 (7th Cir. 2005) ("Section 2244(d)(1)(D) does not restart the time when corroborating evidence becomes available; if it did, then the statute of limitations would fail in its purpose to bring finality to criminal judgments, for any prisoner could reopen the judgment by locating any additional fact."); *Flanagan*, 154 F.3d at 199 (noting that petitioner "is confusing his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim"). Furthermore, it should go without saying that a factual predicate must consist of *facts*. Conclusions drawn from preexisting facts, even if the conclusions are themselves new, are not factual predicates for a claim.

Applying this definition, we conclude that the District Court (adopting the Report and Recommendation of Magistrate Judge Peebles) did not clearly err in concluding that Rivas had "failed to prove that the factual predicate for any of the grounds asserted in his amended petition could not have been discovered by him through due diligence before May 8, 1999." *Rivas III*, 2010 WL 1257938 at *16; *see Rivas IV*, 2010 WL 1257935, at *5 (adopting the magistrate judge's Report and Recommendation in full). We address each ground below.

1. Factual Predicate Supporting Claims of Misconduct and False Testimony by Mitchell

In his Amended Petition, Rivas claims that "newly discovered evidence regarding the conduct of the autopsy, the medical examiner's false evidence and the medical examiner's prior bad acts, warrant the grant of habeas relief." Am. § 2254 Petition at iv. The purportedly new evidence supporting this claim is: (1) evidence that Mitchell was under investigation for professional

33

misconduct at the time of the criminal trial; (2) evidence that Mitchell falsely testified that he had examined "slides" of the victim's brain to determine her time of death, when in fact there were no such slides; and (3) evidence in the form of Wecht's affidavit and hearing testimony demonstrating that Mitchell's trial testimony ignored generally accepted scientific principles and arrived at a time-of-death estimate that was highly implausible.

We agree with the District Court that the Mitchell investigation was discoverable prior to May 8, 1999. Indeed, in his § 440.10 Motion in state court, Rivas specifically cited newspaper coverage of the investigation predating his trial. As the magistrate judge observed, "[t]he publicity regarding that investigation belies any claim that Rivas and his counsel could not have learned of the investigation at or prior to the time of trial through the exercise of due diligence." *Rivas III*, 2010 WL 1257938, at *10.

The evidence suggesting that Mitchell lied when he testified that he adjusted his time-of-death estimate based in part on an analysis of autopsy sectional slides in the medical examiner's file was also discoverable prior to May 8, 1999. On February 5, 1998, at Rivas's request, the Onondaga County Court ordered the Medical Examiner's Office to provide Rivas's counsel with the records of its investigation into Hill's death, including copies of "all slides prepared by the Medical Examiner's Office of any organs or parts of organs of the deceased . . . or slides of any nature prepared in reference to Hill, including microscopic slides." Am. § 2254 Petition Exh. B at 3. A copy of the medical examiner's file was turned over on March 24, 1998. It included the report of Dr. George Collins, who had examined Hill's brain shortly after her body was found and identified no abnormal postmortem decomposition. *See id.* Exh. C at 1, 3. It did not include any sectional slides. Thus, as of March 24, 1998, the factual predicate for the claim involving Mitchell's alleged false testimony regarding so-called "brain slides" was discoverable with due diligence. Indeed, Rivas himself stated

34

in a letter to one of his attorneys dated April 23, 1998, that he "truly wasn't surprised to learn that the [file] didn't have any brain slides," suggesting that he was aware of this fact prior to May 8, 1999. *See Rivas III*, 2010 WL 1257938, at *12 (quoting April 23, 1998, letter of Hector Rivas to Attorney Sidney Manes).

Finally, Wecht's affidavit, though seriously detrimental to the State's case, is not a "factual predicate" as we have defined that term. Rather, it is a *conclusion* based on facts that were known to Rivas or discoverable by him or his counsel at the time of his trial. Wecht himself stated in the affidavit that his conclusions were based upon a review of the medical examiner's file and the transcript of Rivas's criminal trial, in particular Mitchell's testimony. The *information* upon which Wecht relied in forming his conclusion is the factual predicate for this claim. This information was discoverable (and discovered) by March 24, 1998, at the latest, when the medical examiner's file was turned over to Rivas.

Moreover, even if the clock had started running on the date Wecht offered his conclusions, it is undisputed that these conclusions were initially offered in a confidential report to Rivas's counsel on September 10, 1998, fully eight months prior to the critical date of May 8, 1999.

2.    Factual Predicate Supporting *Brady* Claims

Rivas contends that he was unable to establish his *Brady* claims until he succeeded in reconstructing his case file, the original of which was apparently lost at some point after his trial. Rivas's efforts resulted in the Syracuse Corporation Counsel producing two batches of documents in response to requests under New York's Freedom of Information Law. The first was received in September 1998 (with some additional material provided two months later) and the second in September 1999. *See Rivas III*, 2010 WL 1257938, at *7. However, because Rivas only produced the September 1999 batch at the evidentiary hearing on remand, the magistrate judge was "unable to

35

ascertain the extent to which the later produced materials duplicate those received earlier, and in particular whether the alleged *Brady* materials were among the three hundred eighty seven pages provided in September [and November] 1998, prior to the critical date." *Rivas III*, 2010 WL 1257938 at *7.

It would have been preferable for the District Court to order Rivas to submit the September 1998 disclosure so that it could be determined whether the alleged *Brady* materials were contained therein. However, it was Rivas's burden (at that time, with the assistance of counsel) to prove that he could not have discovered the factual predicate for his *Brady* claims prior to May 8, 1999. We agree with the District Court that Rivas did not sustain his burden on this score.

3.      Factual Predicate Supporting Ineffective Assistance of Counsel Claim

In his amended petition, Rivas raises four claims of ineffective assistance of counsel, all tied to Calle's performance at or before trial. Specifically, Rivas claims that Calle: (1) failed to advise him of his right to testify at trial; (2) failed to request a pretrial *Sandoval* ruling;[32] (3) failed to cross-examine adequately one of the prosecution's witnesses; and (4) failed to indicate on the trial record that certain evidence (namely, the letter from Hill to her ex-boyfriend), which the prosecution claimed was discovered at Rivas's home, was in fact discovered at Hill's home. *See* Am. § 2254 Petition at ¶ 12.E. All of these allegations concern errors made prior to or during Rivas's trial in March 1993. Thus, the factual predicates for these claims arose well in advance of May 9, 1999. To the extent Rivas claims that his failure to timely raise his claims of ineffective assistance of trial

---

[32] "In New York state courts a defendant may request a preliminary hearing, known as a *Sandoval* hearing, to determine whether, if he elects to testify, his prior criminal record may be used to impeach his credibility." *Norde v. Keane*, 294 F.3d 401, 408 n.1 (2d Cir. 2002) (citing *People v. Sandoval*, 34 N.Y.2d 371 (1974)).

36

counsel was due to the ineffectiveness of his post-conviction counsel, that argument is relevant to the issue of equitable tolling (addressed below), not to the timeliness of the claim itself.

For these reasons, we conclude, like the District Court, that all of Rivas's claims are untimely under 28 U.S.C. § 2244(d)(1)(D). We proceed to examine whether, despite his failure to timely file his petition, Rivas should benefit from equitable tolling of, or an equitable exception to, the statute of limitations.

## B. Equitable Tolling

Rivas contends that, even if his petition was untimely under the strict operation of 28 U.S.C. § 2244(d)(1), the statute of limitations ought to be equitably tolled. The Supreme Court has confirmed that AEDPA's statute of limitations is not jurisdictional and "does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 205 (2006)). Rather, the limitations period in § 2241(d) "is subject to equitable tolling in appropriate cases"—specifically, where the petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 2560, 2562; *see also Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) ("To qualify for [equitable tolling], the petitioner must establish that extraordinary circumstances prevented him from filing his petition on time, and that he acted with reasonable diligence throughout the period he seeks to toll." (internal quotation marks omitted)). Whether a circumstance is extraordinary depends not on "how unusual the circumstance alleged to warrant tolling is among the universe of prisoners, but rather how severe an obstacle it is for the petitioner endeavoring to comply with AEDPA's limitations period." *Diaz v. Kelly*, 515 F.3d 149, 154 (2d Cir. 2008). "On an appeal from a district court's denial of equitable tolling, we review

findings of fact for clear error and the application of legal standards *de novo*." *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011).

The "extraordinary circumstances" that Rivas points to in this case are: (1) the failure of his state post-conviction counsel, Mitchell Schulman, to file the § 440.10 motion sooner; and (2) the lack of cooperation he received from his trial counsel, Calle, who possessed information essential to Rivas's habeas claims. We conclude that neither circumstance warrants equitable tolling of the limitations period.

Because a lawyer is the agent of his client, the client generally "must 'bear the risk of attorney error.'" *Holland*, 130 S. Ct. at 2563 (quoting *Coleman v. Thompson*, 501 U.S. 722, 752–53 (1991)). Therefore, "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." *Id.* at 2564 (internal citations and quotation marks omitted). Rather, in order to rise to the level necessary to constitute an "extraordinary circumstance," for purposes of tolling § 2254's limitation period, attorney negligence must be so egregious as to amount to an effective abandonment of the attorney–client relationship. *See id.* at 2564–65 ("extraordinary circumstances" found where counsel ignored letters of client emphasizing the importance of filing on time); *Dillon v. Conway*, 642 F.3d 358, 363–64 (2d Cir. 2011) (same); *cf. Maples v. Thomas*, 132 S. Ct. 912, 923 (2012) (emphasizing, in context of showing cause for a procedural default, "the essential difference between a claim of attorney error, however egregious, and a claim that an attorney had essentially abandoned his client").[33]

_____

[33] The majority in *Holland* suggested that a lesser degree of attorney negligence may be required to merit equitable tolling (under the "extraordinary circumstances" standard) than is required to excuse a procedural default (under the "cause and prejudice" standard). *See* 130 S. Ct. at 2563. As the majority explained, this distinction is derived from principles of federalism: The tolling of a federal statute of limitations does not raise the same federalism concerns as does the excusing of a failure to comply with state procedural rules. *See id.* Justice Alito wrote separately, however, and

38

Under this standard, we cannot conclude that Schuman's conduct in failing to file the

§ 440.10 motion sooner was so outrageous or incompetent as to amount to an abandonment of the

attorney–client relationship. In this case, unlike those in which we have found attorney

incompetence to be "extraordinary," there is no indication that Schuman ignored or contravened

Rivas's express instructions by delaying in filing the § 440.10 motion. Rather, Schuman's conduct

appears at worst to be a garden variety case of neglect.

Calle's conduct, on the other hand, presents a closer call. Rivas alleges that Calle essentially

disappeared following his trial in 1993, could not be located until sometime in 1999, and even then

initially refused to cooperate with his post-conviction counsel. These circumstances, if true, would

certainly suggest that Calle abandoned Rivas and perhaps stood in the way of Rivas timely filing his

petition.

However, even if Calle's disappearance constitutes the requisite "extraordinary

circumstance[ ]," Rivas must still establish that he acted diligently to find Calle throughout the time

he seeks to have tolled. *Doe*, 391 F.3d at 175. In this regard, the magistrate judge found that the

efforts of Rivas and his attorneys in tracking down Calle were "both extremely modest and

ultimately successful." *Rivas III*, 2010 WL 1257938 at *8. Although Rivas's post-conviction counsel

were unable initially to find Calle through New York's Office of Court Administration because he

---

argued that an attorney's negligence can only rise to the level necessary to constitute an "extraordinary circumstance" for tolling purposes if it amounts to constructive abandonment of his client. *Id.* at 2567–68 (Alito, *J.*, concurring).

In *Maples*, the Court cited Justice Alito's distinction between attorney negligence and attorney abandonment with approval and clarified that there is "no reason . . . why the distinction between attorney negligence and attorney abandonment should not hold in both" the tolling context and the procedural-default context. 132 S. Ct. at 923 & n.7. Accordingly, we understand the distinction between attorney negligence and attorney abandonment to be applicable here.

39

had been suspended from the bar, Rivas's sister was able to find him within a month after she was asked to do so. *Id.* Furthermore, even after Rivas obtained the affidavit from Calle, he allowed an additional 300 days to elapse between the close of the § 440.10 proceeding and the filing of his habeas petition, without any apparent impediment standing in the way of his timely filing. We therefore cannot conclude that the District Court clearly erred in determining that Rivas failed to act "with reasonable diligence . . . during the time he seeks to have tolled." *Doe*, 391 F.3d at 175. Accordingly, we decline to equitably toll the limitations period.

## C.    Actual Innocence

Having concluded that Rivas's petition was untimely and that he does not qualify for equitable tolling, we come at last to the question of actual innocence. Following the Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995), we have held that a habeas petitioner "may use his claim of actual innocence as a 'gateway,' or a means of excusing his procedural default, that enables him to obtain review of his constitutional challenges to his conviction." *Doe*, 391 F.3d at 161. However, we have not yet decided whether a gateway claim of actual innocence may also excuse an untimely filing under AEDPA's limitation period—a question that has divided our sister courts of appeal. *See Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (*en banc*) (noting circuit split). In prior cases, we have declined to address the question, reasoning that we should only decide whether such an exception is required in a case in which it could make a difference—that is, a case in which the petitioner can actually make a credible and compelling showing of actual innocence. *See Doe*, 391 F.3d 147; *Whitley v. Senkowski*, 317 F.3d 223 (2d Cir. 2003); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107 (2d Cir. 2000).

In this case, we conclude that Rivas has indeed presented a credible and compelling claim of actual innocence. We therefore proceed to address the gateway question. As explained below, we

40

hold that a petitioner who satisfies the Supreme Court's actual-innocence standard may pass through the *Schlup* gateway and have his substantive claims heard on the merits, notwithstanding an otherwise unexcused delay in filing his habeas petition.

1.    The *Schlup* Gateway Standard

As the Supreme Court has repeatedly recognized, "habeas corpus is, at its core, an equitable remedy." *Schlup*, 513 U.S. at 319 (citing cases); *see also Gomez v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 503 U.S. 654, 654 (1992) (per curiam); *Fay v. Noia*, 372 U.S. 391, 438 (1963). For this reason, the Court has long instructed that statutes and rules governing habeas petitions must be applied with an eye toward "the ends of justice." *Sanders v. United States*, 373 U.S. 1, 12 (1963) (holding that a district judge may decline to entertain a successive § 2255 petition "only if he is satisfied that the ends of justice will not be served by inquiring into the merits" (internal quotation marks omitted)). As the Court stated in *Engle v. Isaac*, in "appropriate cases," the principles of comity and finality that underlie federal habeas corpus review "must yield to the imperative of correcting a fundamentally unjust incarceration." 456 U.S. 107, 135 (1982).

In *Murray v. Carrier*, the Court limited the availability of the "miscarriage of justice" exception to "extraordinary case[s], where a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U.S. 478, 496 (1986); *see also Schlup*, 513 U.S. at 321 (stating that *Carrier* "explicitly tied the miscarriage of justice exception to the petitioner's innocence"). Though the Court has never expressly held that a petitioner may qualify for habeas relief based solely on a showing of actual innocence, *see Herrera v. Collins*, 506 U.S. 390, 400–01 (1993),[34] it has recognized

---

[34] The Court has assumed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief." *Herrera*, 506 U.S. at 417. However, it has never explicitly recognized the existence of a freestanding actual innocence claim. *But see In re Davis*, 130 S. Ct. 1, 1 (2009) (Order)

that, in rare cases, an assertion of innocence may allow a petitioner to have his *accompanying* constitutional claims heard despite a procedural bar. *Schlup*, 513 U.S. at 315; *Herrera*, 506 U.S. at 404. As the Court has described it, such an assertion is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup*, 513 U.S. at 315 (quoting *Herrera*, 506 U.S. at 404).

Accordingly, a petitioner seeking access to a federal habeas court in the face of a procedural obstacle must advance *both* a legitimate constitutional claim *and* a credible and compelling claim of actual innocence. It is the combination of the two claims—that the petitioner is likely innocent and that his conviction was likely the result of nonharmless constitutional error—that permits a habeas court to review the petition notwithstanding procedural obstacles in order to avoid a miscarriage of justice. *See id.* at 316. A claim of actual innocence under *Schlup* is therefore procedural, not substantive. *Id.* at 315. The petitioner raising such a claim does not seek to have his conviction vacated on grounds of innocence; rather, he seeks to create sufficient doubt about his guilt that the habeas court will permit him to pursue his accompanying constitutional claims notwithstanding an otherwise applicable procedural bar. *See id.* at 316.

For this reason, the Supreme Court in *Schlup* observed that a petitioner seeking passage through the gateway has "less of a burden" than a petitioner advancing a freestanding, substantive claim of innocence. *Id.* As the Court explained, in the latter case, "the evidence of innocence would have . . . to be strong enough to make [the petitioner's] execution 'constitutionally intolerable' *even if*

---

(transferring habeas petition to district court for determination of whether petitioner on death row could present evidence that "clearly establishes [his] innocence").

his conviction was the product of a fair trial." *Id.*[35] For the gateway petitioner, in contrast, "the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial." *Id.* Accordingly, to present a successful gateway claim of actual innocence a petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.*

To satisfy the *Schlup* standard, a claim of actual innocence must be both "credible" and "compelling." *See House*, 547 U.S. at 521, 538. For the claim to be "credible," it must be supported with "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also House*, 547 U.S. at 537. For the claim to be "compelling," the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

This standard, it must be said, is somewhat cryptic. *See Schlup*, 513 U.S. at 339 (Rehnquist, *C.J.*, dissenting) (deriding the standard as a "classic mixing of apples and oranges"). The Court has offered some clarity, however, by contrasting the gateway standard from others more familiar. Thus, "[t]he petitioner [raising a gateway innocence claim] . . . is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of 'more likely than not' imposes a

---

[35] Though *Schlup* involved a capital crime, the Supreme Court made clear in *Calderon v. Thompson*, that the gateway standard applies to calms of actual innocence of any crime. *See* 523 U.S. 538, 560–66 (1998) (applying *Schlup* standard to a claim of actual innocence of noncapital rape conviction).

lower burden of proof than the 'clear and convincing' standard required under *Sawyer* [*v. Whitley*, 505 U.S. 333, 336 (1992), which applies to claims of actual innocence of the death penalty]." *Id.* at 327 (internal citations omitted).[36]

The Court has also stressed that the gateway standard is "by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), that governs review of claims of insufficient evidence." *Schlup*, 513 U.S. at 330 (parallel citations omitted). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). Whereas, "[u]nder *Jackson*, the use of the word 'could' focuses the inquiry on the *power* of the trier of fact to reach its conclusion," and its ability to do so, the use of the word

---

[36] The *Schlup* Court expressly rejected the more exacting *Sawyer* standard, which requires a petitioner to show "'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty.'" *Schlup*, 513 U.S. 326–27 (quoting *Sawyer*, 505 U.S. at 336).

It bears noting that, with respect to both second and successive petitions and the availability of evidentiary hearings, Congress rejected the *Schlup* standard and reverted to the *Sawyer* standard when it enacted § 2244(b)(2)(B) and § 2254(e)(2). *See* 28 U.S.C. § 2244(b)(2)(B) ("A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . . the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."); *id.* § 2254(e)(2) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that — . . . (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.").

The Supreme Court has made clear, however, that the *Schlup* standard remains in effect for *first* federal habeas petitions, like Rivas's. *See House*, 547 U.S. at 539 ("Neither [§ 2244(b)(2)(B)(ii) nor § 2254(e)(2)] addresses the type of petition at issue here—a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence.").

"would" in the *Schlup* standard "focuses the inquiry on the *likely* behavior of the trier of fact." *Schlup*, 513 U.S. at 330 (emphases added).

Moreover, the *Schlup* inquiry differs from *Jackson* in the mix of evidence that the reviewing court may consider, as well as its vantage point. A court reviewing the sufficiency of the evidence supporting a conviction is limited to considering the evidence actually presented at trial, and must view that evidence in the light most favorable to the prosecution. A court reviewing a gateway claim of actual innocence is not so constrained:

> Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. If new evidence so requires, this may include consideration of the credibility of the witnesses to be presented at trial.

*House*, 547 U.S. at 538–39 (internal citations and quotation marks omitted). The standard therefore requires reviewing courts to "consider all the evidence, old and new, incriminating and exculpatory," and, viewing the record as a whole, to "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 538 (internal citations omitted).

Although the *Schlup* standard is "demanding and permits review only in the extraordinary case," the Court has emphasized that the "standard does not require absolute certainty about the petitioner's guilt or innocence." *Id.* Indeed, as demonstrated in *House*, it may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict. *Id.* at 553–54.

In *House*, the petitioner challenged his conviction for the murder of Carolyn Muncey, an acquaintance who lived near him in rural Tennessee. As in this case, the evidence against House was largely circumstantial, but not insignificant. The victim's daughter testified that, on the night of the murder, her mother was lured out of the house by a man with a "deep voice," like House's. *Id.* at

45

523–24. A witness who participated in the search for Muncey's body stated that he saw House emerge from an embankment near where Muncey's body was found, wiping his hands on a rag. *Id.* at 524–25. Thereafter, when House was questioned by police, he told them that he had been with his girlfriend throughout the evening of the murder, but his girlfriend later revealed that House had in fact left her trailer to go for a walk at about 10:30 or 10:45 in the evening—during the period of time that the county medical examiner had determined Muncey likely died. *Id.* at 526–27. According to the girlfriend, when House returned to the trailer, he was "hot and panting, missing his shirt and his shoes." *Id.* When police interviewed House, they noticed that he had scratches on his arms and legs, as well as a bruise on his right ring finger. Finally, testing by the Federal Bureau of Investigation revealed human blood of Muncey's type on the pants House had been wearing the night of the murder and semen on Muncey's nightgown that was consistent with House's blood type. *Id.* at 528–29. Despite this and other evidence suggesting that House was in fact guilty, the Supreme Court held that he had succeeded in making a compelling showing of actual innocence because he had produced expert testimony that "called into question" the "central forensic proof connecting [him] to the crime," namely, the blood and semen analyses, *id.* at 554, and had produced evidence in the form of new witness testimony that Muncey's husband had confessed to killing her. *Id.* at 548–53.

Applying the *Schlup* standard—and guided by Supreme Court's application of that standard in *House*—we conclude that it is more likely than not, in light of the credible new evidence Rivas has presented in support of his habeas petition, that any reasonable juror would have had a reasonable doubt about his guilt.

46

## 2.        Rivas's Claim of Actual Innocence

"Because the determination as to whether no reasonable juror would find a petitioner guilty beyond a reasonable doubt is a mixed question of law and fact, we review [a] district court's ultimate finding of actual innocence *de novo*." *Doe*, 391 F.3d at 163.

At bottom, Rivas's claim of actual innocence is simple, but compelling: Hill died on Saturday, March 27, 1987, at a time when Rivas had an unchallenged alibi. What makes the claim "credible," as *Schlup* defines that term, is that it is based on new evidence—that is, evidence not heard by the jury—in the form of the essentially unchallenged testimony of a respected forensic pathologist, set against the word of a disgraced medical examiner who testified for the District Attorney while under investigation for potentially criminal misconduct that led, eight months later, to his resigning his office in part to avoid prosecution by the same office.

Without doubt, therefore, the centerpiece of Rivas's actual-innocence claim is the affidavit and testimony provided by Wecht. Wecht's *curriculum vitae* runs nineteen pages. A Fellow and past president of the American College of Legal Medicine and the American Academy of Forensic Sciences, at the time he submitted his affidavit, Wecht served as the Allegheny County Coroner and had appointments as a Clinical Professor at the University of Pittsburgh Schools of Medicine, Dental Health, and Public Health, and as an Adjunct Professor at the Duquesne University School of Law. He is the author of numerous books and articles and was the editor of a leading treatise in the field, *Forensic Sciences*. He estimates that he has testified as an expert on approximately 1,000 occasions, including criminal and civil matters. Remand Hearing Tr. at 16.[37]

---

[37] We are aware that Wecht has also encountered some controversy over the course of his career. However, the State never questioned Wecht's credibility or expertise in the remand hearing ordered by *Rivas III*, despite the fact that our previous summary order specifically recommended that the District Court "examine the likely credibility of the affiants and other witnesses at Rivas's trial,

47

We do not here vouch for Wecht's credibility and expertise, impressive as his credentials may be. However, we do take note of the remarkable—and perhaps telling—absence of any serious challenge to his credibility or expertise by the State at the evidentiary hearing before the magistrate judge on remand.[38] The State did not challenge Wecht as an expert under Rule 702 of the Federal Rules of Evidence and did not call its own expert (or even Mitchell himself) to offer competing testimony. Therefore, as a reviewing court, we have before us only Wecht's essentially unchallenged testimony, which establishes that it is nearly impossible for Hill to have died on Friday night or at any time prior to mid-morning on Saturday, March 28, 1987.

Importantly, the District Court did not reject Wecht's testimony. Rather, the magistrate judge found the testimony to be insufficiently persuasive because Wecht was "unable to state with *absolute certainty* that [Hill] could not have died late Friday night into the early morning hours of Saturday, March 2[8], 1987." *Rivas III*, 2010 WL 1257938 at *15 (emphasis added). This is both a clearly erroneous characterization of Wecht's testimony as a matter of fact, and an erroneous application of the *Schlup* gateway standard as a matter of law. Though Wecht conceded that it was not impossible for Hill to have died as early as 9:30 a.m. on Saturday, he did not agree that she could

---

and the relative strength of the State's case against Rivas in light of any credibility determinations that the District Court sees fit to make," *Rivas III*, 294 F. App'x at 679. There is no basis, therefore, in the record developed in the District Court, to discount Wecht's testimony.

[38] The only challenge the State made to Wecht's testimony was its unsupported assertion that his opinion was based only on second-hand information provided to him by Rivas's lawyers. In fact, Wecht stated, both in his affidavit and in the evidentiary hearing before the magistrate judge, that his conclusions were based on an examination of the autopsy file and a review of Mitchell's trial testimony.

Thus, the record is clear that Wecht testified not only based on his own experience and expertise, but also with full awareness of the factors that led Mitchell to conclude that Hill died on Friday, March 27. As he stated on cross-examination, "the science does not change because some other things of a nonscientific nature come into play." Remand Hearing Tr. at 58.

have died any earlier. He further clarified that he was "allowing for possibilities on a bell-shaped curve," meaning it was most likely that she died early Sunday morning and much less likely that she could have died at any time before 3:30 in the afternoon on Saturday. Remand Hearing Tr. at 64. Finally, as discussed above, when asked whether it would be impossible for Hill to have died as early as 2:30 a.m. on Saturday morning, Wecht responded:

> I am always very hesitant to use words like absolute and impossible, in the realm of human biology, . . . but I'll answer with reasonable medical probability or reasonable medical certainty, I do not believe that Ms. Hill could have been killed as far back as 2:30 a.m. on Saturday morning, August 28, that is after midnight on Friday, the 27th into the morning hours of Saturday, the 28th, with reasonable medical probability.

*Id.* at 64–65. Wecht can hardly be expected to have stated his opinion with any more certainty. "Absolute certainty" cannot be the standard by which to evaluate the testimony of a forensic witness; it is not possible for anyone who was not actually present at the time of death and it is certainly not required by law. Indeed, in *House*, the Supreme Court explicitly stated that "the *Schlup* standard *does not require absolute certainty* about the petitioner's guilt or innocence." 547 U.S. at 538 (emphasis added).

The appropriate question for the District Court on remand was not whether Wecht could conclusively and definitively establish Rivas's innocence, but whether, in light of Wecht's testimony and the other new evidence Rivas produced (including the Lazarski affidavit and the affidavit of the unnamed neighbor who heard a car speed away from Hill's apartment on Saturday night), a reasonable juror considering the entire mix of evidence in the case would more likely vote to acquit or to convict. Undertaking this inquiry ourselves following a careful review of the entire record in this case, we conclude that it is more likely than not that a reasonable juror, considering all the evidence, old and new, would vote to acquit Rivas of the murder.

49

We concede that the circumstantial evidence linking Rivas to the crime is not trivial. He was apparently enamored of Hill and seemed unwilling to accept that their relationship was over. Two witnesses placed him near Hill's house at 11:00 p.m. on Friday night. Trial Tr. at 533–34, 936–37.[39] He acted strangely when questioned by police and seemed to have no reaction when told that Hill had died. *Id.* at 246–47. An apparent "shrine," which included a photograph of Hill, was found in his closet. *Id.* at 270–74, 316. Finally, a witness testified that Rivas uttered words that a jury could interpret to be incriminatory when, several weeks after Hill's death, he was heard to drunkenly mutter to himself, "Valerie, Valerie, I didn't mean to do it." *Id.* at 817.[40]

Against this, the *nonscientific* evidence tending to exonerate Rivas is significant, but likely not compelling enough to satisfy the *Schlup* standard. We do not regard the alleged confession of Patsy Barricella as particularly credible and, inasmuch as it was presented at Rivas's trial, the jury has already rejected it. The evidence that Hill was involved in an intimate relationship with a man other than Rivas around the time of her murder, that she had lodged a complaint against a coworker not long before her death, and that one of her neighbors had been arrested for burglary and was known to peer through windows, might suggest that the police failed to pursue other leads in the investigation, but does not compellingly point to Rivas's innocence. The evidence, taken together, raises doubts about Rivas's guilt, but it does not, in isolation, so undermine the State's circumstantial evidence as to satisfy the *Schlup* standard.

---

[39] One of these witnesses, it bears noting, appears to have been the sister of the individual who had previously been arrested for burglarizing Hill's apartment and was questioned by police in their investigation of Hill's murder. *See* note 23, *ante*.

[40] Despite the fact that the Hill murder was a well known "cold case" in Syracuse for six years, this witness told nobody but his girlfriend what he had heard, and the girlfriend came forward only after Rivas was indicted in November 1992. *See* Trial Tr. 828–29.

Ultimately, however, it does not matter how much indirect, circumstantial evidence the State can amass to suggest that Rivas killed Hill on Friday night, if she in fact died on Saturday night—at a time when Rivas had an alibi that the District Attorney himself characterized as "complete." Trial Tr. at 55. Therefore, the question turns almost entirely on the relative credibility of the prosecution's expert, Mitchell, and Rivas's expert, Wecht. In this regard, we stress once more that the State, despite having the opportunity to challenge Wecht's testimony at the evidentiary hearing, or to call its own expert to support Mitchell's conclusions, failed to raise any serious question about Wecht's qualifications or conclusions. We therefore are left to weigh the unchallenged testimony of a renowned forensic pathologist—who concluded "to a reasonable degree of medical certainty" that Hill could not have died on Friday—against the testimony of a disgraced and allegedly beholden medical examiner, who initially told police that Hill died on Saturday evening, later told the grand jury that it was on the "outside edge of possibility" that she died on Friday evening, and finally testified, without reference to any degree of medical certainty, that it was "more likely" that she died on Friday night.

Although Mitchell pointed to extrinsic factors that support his conclusion that Hill died on Friday night—primarily that she was not heard from or seen after Friday night, despite having made plans to visit a friend outside Albany—the Lazarski affidavit and the police report memorializing the interview with the unnamed neighbor each offer indirect support to Wecht's conclusion that the murder most likely occurred late Saturday night. However, as Wecht testified at the remand hearing, his conclusions are based primarily on science, and "the science does not change because some other things of a nonscientific nature come into play." Remand Hearing Tr. at 58.

Finally, though we do not suggest that Mitchell intentionally lied on the stand or that District Attorney Fitzpatrick suborned perjury, we think a reasonable juror would discredit Mitchell's

51

testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial. In short, based on the record before us, any reasonable juror would almost certainly credit Wecht over Mitchell and would therefore, more likely than not, harbor a reasonable doubt about Rivas's guilt.

To be sure, this is a close case. Indeed, we would not expect a lesser showing of actual innocence to satisfy the *Schlup* standard. After all, we cannot be sure that Wecht's testimony would stand up against that of another respected pathologist, because the State did not challenge him. And, even assuming, as we must, that Wecht's testimony was credible, there remains some troubling circumstantial evidence pointing to Rivas. But it was not Rivas's burden to prove his innocence beyond a reasonable doubt, and we are not called upon in this case to determine once and for all who murdered Valerie Hill. Rather, the issue before us is solely whether Rivas has, through credible new evidence, cast sufficient doubt upon his guilt that we "cannot have confidence in the outcome of [his] trial" unless we can be assured that "the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 315.

We conclude that he has, largely because the record before us compares favorably to that presented in *House*. Like House, Rivas faces considerable circumstantial evidence suggesting he had an opportunity, and perhaps a motive, to commit the murder with which he was charged. But, again like House, he has produced highly persuasive—and, in Rivas's case, largely unchallenged— expert testimony, which casts considerable doubt on the "central forensic proof" connecting him to the crime. Both men also produced evidence—concededly weaker in Rivas's case—suggesting that

52

another man may have been the killer.[41] On the whole, comparing the two cases, we believe Rivas's showing is at least as strong as that which gained House entry through the *Schlup* gateway.

Accordingly, following the guidance of the Supreme Court, we conclude that "although the issue is close . . . this is the rare case where—had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *House*, 547 U.S. at 554.

3.      A Credible and Compelling Claim of Actual Innocence Provides Equitable Relief from AEDPA's Limitations Period

Although the Supreme Court has established that a credible and compelling claim of actual innocence may provide a "gateway" around other species of procedural default, it has not yet considered whether such a claim may excuse a filing that is untimely under § 2244(d)(1). As we explained in *Doe v. Menefee*, the "doctrine of actual innocence was developed to mitigate the harshness of the *judicial limitations* placed on a petitioner's ability to file successive or otherwise procedurally defaulted habeas petitions in the federal courts." 391 F.3d at 160 (emphasis added). These "judicial limitations" were later codified in AEDPA, as was a variation of the actual innocence exception. *See* 28 U.S.C. §§ 2254(b)(2), 2244(b)(2)(B). However, because there was no statute of limitations governing the filing of habeas-corpus petitions prior to AEDPA, there was likewise no occasion to apply the actual innocence standard to excuse untimely filed petitions. Accordingly, the question presented in this case is whether the judicially created *Schlup* gateway standard applies in

----

[41] Although we do not find the evidence suggesting that Patsy Baricella may have been Hill's killer to be especially persuasive, we note that the testimony in *House* pointing to another killer was specifically found to be not credible by the District Court presiding over House's evidentiary hearing, which noted that it was "not impressed with the allegations of individuals who wait over ten years to come forward." *See House*, 547 U.S. at 557–58 (Roberts, *C.J.*, concurring in the judgment in part and dissenting in part).

this slightly different context to provide an equitable exception to AEDPA's legislatively imposed limitations period, 28 U.S.C. § 2244(d)(1).[42]

As stated at the outset, § 2244(d)(1) provides that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1); *see* note 1, *ante*. We have suggested in passing that "[a] claim of actual innocence *could* provide a basis for excusing [a] late filing." *Friedman v. Rehal*, 618 F.3d 142, 152 (2d Cir. 2010) (emphasis added). However, we have thus far avoided deciding whether it *does*, opting instead to wait for a case in which such a determination actually matters—that is, a case, like this one, in which the petitioner has satisfied the *Schlup* burden. *See Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004); *Whitley v. Senkowski*, 317 F.3d 223 (2d Cir. 2003); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107 (2d Cir. 2000).

A number of our sister circuits have examined this issue and reached differing conclusions. *Compare Lee v. Lampert*, 653 F.3d 929, 934 (9th Cir. 2011) (*en banc*) ("*Lee II*") (holding that a

---

[42] Though some courts have framed the question as whether AEDPA allows for equitable *tolling* of the limitations period in cases where the petitioner has advanced a compelling claim of actual innocence, we believe it is more accurate to describe the issue as whether an equitable *exception* to § 2244(d)(1) exists in such cases. See *Lee v. Lampert*, 653 F.3d 929, 932 n.5 (9th Cir. 2011) (*en banc*) ("*Lee II*") ("The more accurate characterization is 'equitable exception,' because equitable tolling involves different theoretical underpinnings."). Equitable tolling, after all, requires a showing that "some extraordinary circumstance stood in [the petitioner's] way and prevented timely filing." *Holland v. Florida*, 130 S. Ct. 2549, 2662 (2010) (internal quotation marks omitted). Although it may rightly be considered an extraordinary circumstance, it cannot be said that a prisoner's actual innocence *prevents* him from timely filing. Furthermore, a petitioner seeking to benefit from equitable tolling must show that he "acted with reasonable diligence throughout the period he seeks to toll." *Doe*, 391 F.3d at 159. Such a due-diligence requirement is incompatible with a workable actual innocence exception. Inasmuch as the exception was designed to provide a gateway around procedural defaults that would otherwise require a showing of cause and prejudice, it is evident that due diligence is not necessary to support a gateway claim of actual innocence. *See, e.g., Perkins v. McQuiggin*, 670 F. 3d 665, 672–76 (6th Cir. 2012); *Lee II*, 653 F.3d at 934; *San Martin v. McNeil*, 633 F.3d 1257, 1267–68 (11th Cir. 2011); *Lopez v. Trani*, 628 F.3d 1228, 1230–31 (10th Cir. 2010).

compelling claim of actual innocence constitutes an equitable exception to AEDPA's limitations period); *San Martin v. McNeil*, 633 F.3d 1257, 1267–68 (11th Cir. 2011) (same); *Lopez v. Trani*, 628 F.3d 1228, 1230–31 (10th Cir. 2010) (same); *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2006) (same); *with Escamilla v. Jungwirth*, 426 F.3d 868, 871–72 (7th Cir. 2005) (holding that no such exception exists); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (same); *David v. Hall*, 318 F.3d 343, 347 (1st Cir. 2003) (suggesting the same, in *dicta*).[43] We find more persuasive the reasoning expressed in the cases holding that an equitable exception to AEDPA's limitations period exists for compelling claims of actual innocence. We therefore join the Sixth, Ninth, Tenth, and Eleventh Circuits in concluding that the *Schlup* actual-innocence gateway extends to claims otherwise barred by § 2244(d)(1).

In reaching this conclusion, we find it relevant that no court has settled on the contrary conclusion following the Supreme Court's decision on a related question in *Holland v. Florida*, 130 S. Ct. 2549 (2010).[44] In *Holland*, the Court concluded that AEDPA's limitations period "is subject to equitable tolling in appropriate cases." *Id.* at 2560. The Court reasoned that, because § 2244(d) "is not jurisdictional[,] [i]t does not set forth an inflexible rule requiring dismissal whenever its clock has

---

[43] In *Riva v. Ficco*, 615 F.3d 35 (1st Cir. 2010), the First Circuit appeared to retreat from the position it espoused in *David v. Hall*, suggesting that the earlier case merely "express[ed] skepticism" about whether a credible actual-innocence claim may excuse an untimely filing, and remanded the question for further consideration in the district court. *See id.* at 44 n.4.

The Eighth Circuit has also considered this question, adopting a kind of middle ground whereby an actual-innocence claim may be treated as an "extraordinary circumstance" bearing on the general issue of equitable tolling. *See Flanders v. Graves*, 299 F.3d 974, 976–78 (8th Cir. 2002).

[44] In *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010) ("*Lee I*"), a panel of the Ninth Circuit concluded that, notwithstanding the Supreme Court's guidance in *Holland* (which was decided a mere three weeks before *Lee I* was filed), a claim of actual innocence does not provide an exception to AEDPA's limitations period. However, the panel's decision was subsequently reversed by the *en banc* Ninth Circuit. *See Lee II*, 653 F.3d at 932.

run." *Id.* (internal citation and quotation marks omitted). Rather, in recognition of the fact that "equitable principles have traditionally governed the substantive law of habeas corpus," the limitations period is "subject to a rebuttable presumption in *favor* of equitable tolling," *id.* (internal quotation marks omitted)—a presumption that cannot be rebutted "absent the clearest command" of Congress. *Id.* at 2560–61. Because the language of § 2244(d) reads like a "run-of-the-mill" statute of limitations, and is not "unusually emphatic"—and because equitable tolling is not inconsistent with AEDPA's basic purposes—the Supreme Court concluded that Congress had not rebutted the presumption that equitable tolling would continue to apply after AEDPA's enactment. *Id.* at 2561–62.

*Holland* demonstrates that traditional principles of equity continue to have a place in the review of habeas petitions following the enactment of AEDPA. The only question for us, therefore, is whether there is a meaningful difference between equitable *tolling*, as described in *Holland*, and the equitable *exception* from which Rivas seeks to benefit in this case. We conclude that there is not.

The reasoning of *Holland* is not limited to equitable tolling. Rather, the Court emphasized more generally that "we will 'not construe a statute to displace courts' *traditional equitable authority* absent the clearest command.'" *Id.* at 2560 (emphasis added) (quoting *Miller v. French*, 530 U.S. 327, 340 (2000) (other internal quotation marks omitted)). The authority to carve out limited exceptions to nonjurisdictional statutes of limitations where compelled by the interests of justice has long been recognized to be within the traditional equitable power of the courts. *See, e.g.*, *Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 428 (1965) (observing that the "policy of repose" inherent in statutes of limitations "is frequently outweighed . . . where the interests of justice require vindication of the plaintiff's rights").

56

The actual-innocence gateway is also firmly grounded in the courts' traditional equitable authority—specifically "in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U.S. at 404. As the Supreme Court has observed, "concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system," reflecting "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Schlup*, 513 U.S. at 325. Motivated by this concern, the Court recognized over a quarter-century ago an equitable exception to procedural rules intended to limit habeas relief in "extraordinary case[s], where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

This fundamental principle was well entrenched by the time Congress enacted AEDPA in 1996. *See, e.g.*, *Schlup*, 513 U.S. at 319–23; *Sawyer*, 505 U.S. at 339; *Kuhlmann v. Wilson*, 477 U.S. 436, 442 (1986); *Smith v. Murray*, 477 U.S. 527, 537 (1986); *Carrier*, 477 U.S. at 496. To be sure, actual innocence had not been recognized as an exception to a federal statute of limitations prior to AEDPA, because no such limitation period existed before the enactment of § 2244(d) as part of AEDPA. However, many states enforced their own statutes of limitations in their collateral review procedures during this time and the Supreme Court had held that a procedural default based on a failure to timely file for post-conviction relief in state court could be excused if the "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (internal quotation marks omitted). It follows, therefore, that the equitable authority of the courts to excuse an untimely filing where a petitioner makes a compelling showing of actual innocence was well established before Congress enacted AEDPA. We will relinquish that authority only if Congress has clearly commanded it.

We are not convinced that any such clear command can be derived from AEDPA's statutory text. It is true that AEDPA expressly refers to actual innocence in its successive-petition provision, which allows a petitioner to proceed with a successive petition only if he can show "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *See* 28 U.S.C. §§ 2244(b)(2)(B)(ii).[45] This standard, of course, is more exacting than the Supreme Court's *Schlup* gateway standard, which allows a petitioner's *first* habeas petition to be adjudicated on the merits if it is "more likely than not" that no reasonable juror would find proof of guilt beyond a reasonable doubt. However, the fact that Congress adopted a more stringent standard to govern successive petitions does not mean that it clearly intended to prevent application of the preexisting *Schlup* standard to untimely *first* petitions. As Judge Lewis Kaplan has observed, "[i]t is difficult to imagine that a Congress that explicitly allowed maintenance of a second or successive petition where the applicant makes out a strong claim

---

[45] In pertinent part, § 2244(b)(2) provides that:

> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . . (B) . . . (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A similar exception exists to AEDPA's evidentiary-hearing provision, 28 U.S.C. § 2254(e)(2), which provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

58

of actual innocence implicitly intended to foreclose as untimely an initial petition brought by the individual with a comparable claim." *Garcia v. Portuondo*, 334 F. Supp. 2d 446, 461 (S.D.N.Y. 2004); *cf. Lonchar v. Thomas*, 517 U.S. 314, 324 (1996) ("Dismissal of a *first* federal habeas petition is a particularly serious matter." (emphasis in the original)). Indeed, in *House*, the Supreme Court explicitly held that the "clear and convincing evidence" standard of review found in § 2244(e)(2)(B)(ii) and in § 2254(e)(2)—which sets the threshold for obtaining an evidentiary hearing on a claim that was not developed in state court—is inapplicable to "a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence." *House*, 547 U.S. at 539. We therefore conclude that §§ 2244(e)(2)(B)(ii) and 2254(e)(20 represent a Congressional intent to increase the burden of proving actual innocence in *successive* petitions, but not to eliminate or disturb the preexisting *Schlup* standard for first petitions. *See Lee II*, 653 F.3d at 937; *Souter*, 395 F.3d at 598–99.

Those of our sister circuits that have concluded that § 2244(d) does not admit of any actual-innocence exception have pointed to the fact that, in subsections (B), (C), and (D) of § 2254(d)(1), "the statute establishes three 'very specific exceptions,'" *Lee I*, 610 F.3d at 1127, *rev'd Lee II*, 653 F.3d 929 (quoting *David*, 318 F.3d at 343), none of which mentions actual innocence. Therefore, these courts have concluded, the doctrine of *expressio unius est exclusio alterius* (express mention of one thing excludes all others) dictates that Congress could not have intended for courts to apply an additional actual-innocence exception to the limitations period. In our view, these decisions rest on an error of statutory construction, which the Supreme Court itself identified in *Holland*. There, the Court explained that the events described in §§ 2244(d)(1)(B)–2244(d)(1)(D) are not "*exceptions* to [AEDPA's] basic time limits," but rather, alternative "events that *trigger* its running." 130 S. Ct. at

59

2561 (first emphasis added). In other words, there is no express mention, supportive or dismissive, of exceptions to the limitations period in AEDPA's statutory text.

Accordingly, absent a clear congressional command to the contrary, we conclude that the preexisting equitable authority of federal courts to hear barred claims if they are accompanied by a compelling showing of actual innocence survives the enactment of AEDPA and applies to claims otherwise barred by its statute of limitations, § 2244(d)(1).

Moreover, we conclude that the recognition of an actual-innocence exception to § 2244(d) is consistent with AEDPA's basic purposes. As the Supreme Court explained in *Holland,*

> We recognize that AEDPA seeks to eliminate delays in the federal habeas review process. But AEDPA seeks to do so without undermining basic habeas corpus principles and while seeking to harmonize the new statute with prior law, under which a petition's timeliness was always determined under equitable principles. When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the 'writ of habeas corpus plays a vital role in protecting constitutional rights.' It did not seek to end every possible delay at all costs.

130 S. Ct. at 2562 (quoting *Slack v. McDaniel*, 529 U.S. 473, 483 (2000)) (internal citations omitted); *cf. Calderon v. Thompson*, 523 U.S. 538, 558 (1998) ("The miscarriage of justice standard is altogether consistent . . . with AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence.").

Finally, we agree with the Court of Appeals for the Third Circuit that, "[w]ere no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent . . . we would be faced with a thorny constitutional issue." *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir. 1997) (internal quotation marks omitted). As we observed in *Triestman v. United States*, a case addressing a federal prisoner's collateral appeal, "serious Eighth Amendment and due process questions would arise with respect to [§ 2244(d) of] the AEDPA" if it were read to deny collateral

60

review to a prisoner who is actually innocent. 124 F.3d 361, 378–79 (2d Cir. 1997); *see also In re Davis*, 130 S. Ct. 1, 1 (2009) (per curiam) (Stevens, *J.*, concurring) (citing *Triestman*'s discussion of "serious constitutional concerns that would arise if AEDPA were interpreted to bar judicial review of certain actual innocence claims."); *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir. 2005) (concluding that "constitutional concerns counsel in favor of upholding equitable tolling based on a credible claim of actual innocence"); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) (noting that a claim of actual innocence may be among the "circumstances where the limitation period at least raises serious constitutional question and possibly renders the habeas remedy inadequate and ineffective"). The Supreme Court's gateway standard allows courts to examine compelling claims of actual innocence while remaining within AEDPA's framework, without necessitating the more delicate task of determining whether § 2244(d) itself violates the Constitution when applied to deny review to a first-time petitioner raising a credible and compelling claim of actual innocence along with claims of constitutional error.

For the foregoing reasons, we join the growing chorus of appellate courts to recognize, in *Holland*'s wake, an equitable exception to AEDPA's limitation period in extraordinary cases like this one, in which the petitioner has made a compelling showing of his actual innocence under the *Schlup* gateway standard.

## CONCLUSION

To summarize, we conclude that:

(1) Rivas's petition was not timely under 28 U.S.C. § 2244(d)(1); and

(2) that he has not shown the extraordinary circumstances and reasonable diligence required to qualify for equitable tolling.

61

However,

(3) because Rivas has produced credible and compelling—and essentially unchallenged—expert testimony which calls into serious doubt the central forensic evidence linking him to the crime and persuasively suggests that the victim died at a time when Rivas had an unchallenged alibi, we conclude that this is the exceptional case where a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit.

Having made such a showing,

(4) Rivas is entitled to an equitable exception to AEDPA's limitation period.

Accordingly, the judgment of the District Court dismissing Rivas's claims as time-barred is **REVERSED**.

We emphasize that we have not determined that Rivas is in fact innocent of Hill's murder. Rather, we have found that he has produced sufficient evidence of his innocence to undermine confidence in the justice of his continued incarceration unless we can also be satisfied that his trial was free of nonharmless constitutional error. *See Schlup*, 513 U.S. at 315. We therefore **REMAND** the cause to the District Court for full consideration of Rivas's underlying constitutional claims, which have heretofore not been addressed. *See* § 2254 Petition at i–ii.[46] Inasmuch as Rivas has not

---

[46] The Supreme Court has recently held that, "if a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011). We leave it to the District Court to determine, in the first instance, whether any of Rivas's substantive claims were not decided on the merits by the state court and, if not, whether an evidentiary hearing is required.

In view of the very capable representation provided to Rivas in his first remand hearing, and during his § 440.10 proceedings in state court, we encourage the District Court to consider reappointing Kimberly Zimmer or Sally Wasserman, or both, to assist Rivas going forward. We note as well the important role attorney Sidney Manes has played in this case, and trust that whoever represents Rivas will benefit from his continuing involvement.

advanced a freestanding substantive claim of actual innocence, the issue of his actual innocence or guilt is no longer relevant to the adjudication of his habeas petition, except insofar as it relates to prejudice.

Should the District Court determine that this matter must yet again be referred to a magistrate judge, we instruct that it not be reassigned to Magistrate Judge Peebles. We cast no aspersions on the performance of Magistrate Judge Peebles in this case and have no reason to doubt his impartiality. (Indeed, Rivas has not sought to have him disqualified.) However, as noted above, *see* note 24, *ante*, Magistrate Judge Peebles previously disclosed that he had served with Fitzpatrick in the Onondaga County District Attorney's Office and had asked Fitzpatrick to be the godfather of his daughter. Rivas alleges that Fitzpatrick deliberately withheld exculpatory information from him and suggests improper collusion between Fitzpatrick and the medical examiner, Mitchell. Though we do not comment on, let alone endorse, the merits of these claims, in order to avoid any appearance of impropriety we think the interests of justice require that this matter be adjudicated by judges without close personal and professional ties to the prosecutor. We therefore direct that, if the assistance of a magistrate judge is indeed required, the matter should be referred to a magistrate judge who does not have a personal or professional relationship with Fitzpatrick or the Office of the District Attorney of Onondaga County.

Finally, we direct that jurisdiction be returned to this Court upon a letter request from any party following a decision on the merits of Rivas's constitutional claims. Upon such a restoration of jurisdiction, the matter is to be referred to this panel.

Hector Rivas has been incarcerated for the murder of Valerie Hill for nearly twenty years. Though we express no view on the merits of his substantive constitutional claims, in light of our holding that we cannot have confidence in Rivas's continued incarceration unless we are assured

63

that he was convicted after a fair trial, we urge the District Court to take whatever steps needed, in the exercise of its discretion, to facilitate a full, fair, and speedy adjudication of the merits of his petition.